**2024 UT App 111**

## THE UTAH COURT OF APPEALS

THOMAS WILLIAMSON AND JENNIFER WILLIAMSON,
Appellants,
*v.*
ANNE FARRELL, DAVE FARRELL, AND LAURA BLACK,
Appellees.

Opinion
No. 20221084-CA
Filed August 8, 2024

Third District Court, Salt Lake Department
The Honorable Patrick Corum
No. 170902215

Erik A. Olson and Christopher D. Ballard,
Attorneys for Appellants

John R. Loftus, Christine E. Ellice, J. Mark Gibb, and
Matthew J. Orme, Attorneys for Appellees

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES RYAN M. HARRIS and JOHN D. LUTHY concurred.

ORME, Judge:

¶1     Thomas and Jennifer Williamson (collectively, Plaintiffs) brought an action against Anne Farrell, Dave Farrell, and Laura Black (collectively, Defendants) seeking a declaratory judgment that Plaintiffs did not commit elder abuse against Thomas, Anne, and Laura's mother, Ruth Williamson.[1] By the time of trial, Plaintiffs' action had been limited to five grounds of elder abuse under Utah statute. Of the five grounds, the trial court ruled that

---

1. As is sometimes our practice, we refer to family members by their first names, with no disrespect intended by the apparent informality.

Plaintiffs abused Ruth by causing her harm, but it concluded that they did not commit elder abuse under the remaining four statutory grounds it considered, including that of financial exploitation. Because we hold that the trial court only had jurisdiction to adjudicate whether Plaintiffs financially exploited Ruth—and not the other four grounds—we vacate the court's judgment except for its ruling related to financial exploitation. And because our resolution of the jurisdictional issue raises new questions regarding whether Defendants are entitled to attorney fees under Utah's bad faith statute, we remand this matter for the trial court to reconsider Defendants' attorney fees request in light of our resolution of this appeal.

BACKGROUND

*First Appeal*

¶2    Ruth and George B. Williamson had six children: Thomas, George, Anne, Sue, Patricia, and Laura. During their lives, Ruth and George B. accumulated substantial assets, including income-producing real property in California and Utah. They executed several estate planning documents, naming their children as beneficiaries in some of them. For over thirty years, Thomas's income has come from his management of the family businesses and assets.

¶3    After George B. passed in 2009, Ruth continued to live in her home of fifty years located in Palos Verdes Estates, California. In March 2016, Ruth moved to Utah, where she passed away that November at the age of ninety-one. At the time of her death, Ruth was residing with Plaintiffs in their home.

¶4    In December 2016, Thomas filed a petition in Utah's Fourth District Court (the Probate Action) seeking to formally administer Ruth's estate, of which he claimed to be the rightful personal

representative. In February 2017, Anne and Laura objected to the petition, alleging that Thomas was "unsuitable to serve as a personal representative" because he had, among other things, engaged in self-dealing and elder abuse. Concerning the allegations of elder abuse, the objection stated that Anne and Laura were "compiling further evidence that reflects that [Thomas] engaged in elder abuse against [Ruth] while she was living under the laws of the State of California and [they were] addressing that issue with California counsel toward the end of pursuing a formal action in that regard." Shortly afterward, in April 2017, Anne and her husband, Dave, filed declarations in the Probate Action alleging that Thomas had taken Ruth to Utah in March 2016 under false pretenses,isolated her, and prevented her return to California, causing Ruth to suffer from depression as well as mental and emotional anguish. Dave's affidavit mentioned that Jennifer, Thomas's wife, helped block Ruth's communication with other family members.

¶5    Also in April 2017, Plaintiffs filed the current civil action against Defendants in Utah's Third District Court seeking "[a] declaratory judgment that [they] did not commit elder abuse against Ruth Williamson, [they] did not violate any statutory or common law duties owed to Ruth Williamson, and [Defendants] have no actionable claim against [them] pertaining in any way to Ruth Williamson."

¶6    Less than a week after Plaintiffs filed the current action, Defendants commenced an action in California against Plaintiffs and eleven others (the California Action). That complaint alleged, among other things, elder abuse, elder financial abuse, and intentional infliction of emotional distress related to the care of Ruth and her estate. Jennifer was eventually dismissed as a defendant in the California Action for lack of personal jurisdiction.

¶7     Later, in the current action, the district court granted judgment on the pleadings and dismissed the complaint based on common-law efficiency grounds and its determination that a declaratory judgment "would not terminate the uncertainty or controversy giving rise to the proceeding." Utah Code Ann. § 78B-6-404 (LexisNexis 2022).[2] Specifically, the court stated that "a judgment in this case would not conclude the litigation in the other cases." The court further noted that "there has been nothing presented in the complaint or the pleadings since as to whose definition or standard of 'elder abuse'"—Utah's or California's—Plaintiffs were "actually asking the court to apply." The court stated that if Utah law applied, "then a declaratory judgment in this case would potentially have no bearing on the California actions" and that if California law applied, then "the California courts are in a far better position to interpret and apply their own laws."

¶8     Plaintiffs appealed, resulting in our earlier decision in this matter, *Williamson v. Farrell*, 2019 UT App 123, 447 P.3d 131 (*Williamson I*). In that appeal, we reversed the district court's dismissal of the current action and remanded for further proceedings. *Id.* ¶ 23. We held that "the district court took too broad a view of its statutory authority to abdicate," *id.* ¶ 15, because the declaratory judgment statute's use of the singular term "proceeding" indicates "that it refers to the specific declaratory judgment action at hand, and not to any larger web of disputes between the parties," *id.* ¶ 14. We also held that the court improperly dismissed the action insofar as the dismissal was premised on the court's common law discretion because Jennifer was not a party to the California Action or the Probate Action and

---

2. Because the applicable provisions of the Utah Code in effect at the relevant times do not differ from those in the most current printed version in any way material to this appeal, we cite that version of the Utah Code for convenience.

because the California Action was filed after the current action. *Id.* ¶¶ 20–21.

*Remand*

¶9    Shortly following remand, in response to the district court's request for clarification regarding the scope of their complaint, Plaintiffs submitted a letter stating that

> the focus of [their] declaratory relief claim is to obtain a declaration from the Court that they did not commit elder abuse against Ruth Williamson in any way, including physical or financial elder abuse. Accordingly, the "statutory or common law duties owed to Ruth Williamson" referenced in the complaint refer to statutory and common law duties relating to elder abuse. These duties are outlined in Utah Code § 62A-3-314[3] as well as Utah common law governing claims for elder abuse, breach of fiduciary duty, and confidential relationships.

¶10    Following discovery, the parties filed cross-motions for summary judgment. In their motion, Plaintiffs argued, in relevant part, that Utah law—not California law—should be applied to the elder abuse allegations. In their opposition to Plaintiffs' summary judgment motion, Defendants stated they did "not dispute that the substantive law of Utah should apply to the determination of Plaintiffs' declaratory relief claim as they have framed it in the pleadings and subsequently confirmed in discovery."[4] Later, in

---

3. This statute has since been renumbered as Utah Code section 26B-6-213.

4. Defendants did, however, maintain that California law should govern the allegations of elder abuse at issue in the California

(continued…)

their trial brief, Plaintiffs also argued that "the Court should apply Utah law and enter" a declaration "that Thomas and Jennifer never abused Ruth in Utah."

¶11 As part of their summary judgment motion, Plaintiffs also argued that the claims of elder abuse at issue in the case were limited to the alleged financial exploitation of Ruth because that was the only relevant claim for which Utah law provided a private right of action.[5] The parties also argued the issue of which side bore the burden of proof regarding the elder abuse claims.

¶12 In an oral ruling, the court denied the cross-motions for summary judgment, concluding that disputed issues of material fact precluded the entry of summary judgment in favor of either party. Also pretrial, the court ruled that Plaintiffs bore the burden of establishing the existence of a justiciable controversy, while Defendants bore the burden of proving by a preponderance of the evidence that Plaintiffs committed elder abuse against Ruth. The court further clarified that "[t]he scope of this case is related to solely acts committed after Ruth was brought to the state of Utah, acts committed wholly within the state of Utah, and under Utah law." Thus, the court limited the presentation of evidence to the timeframe of Ruth's relocation to Utah in March 2016 until her death in November 2016, and it expressly excluded any evidence related to Ruth's estate planning or the validity of any of Ruth's estate planning documents in part because that was already at issue in the Probate Action. The court also agreed with Defendants that the scope of the declaratory judgment action

---

Action and that any declaratory judgment obtained in the current action cannot be used to "estop" the California Action.

5. Plaintiffs also argued that in the event California law applied, which provides broader private rights of action for elder abuse than Utah law, *see* Cal. Welf. & Inst. Code §§ 15610.07, 15657, there was no evidence to support claims of elder abuse.

went "beyond" "conduct that gives rise to a private cause of action" under Utah's elder abuse statute and should include "a real broad cross section of physical, financial elder abuse and exploitation."

*Trial Court's Findings of Fact and Conclusions of Law*

¶13    In November 2021, the case proceeded to a three-day bench trial, during which the trial court considered whether Plaintiffs committed elder abuse under Utah statute against Ruth by (1) knowingly inflicting harm, (2) isolating her, (3) emotionally or psychologically abusing her, (4) neglecting her, or (5) financially exploiting her. *See* Utah Code Ann. § 26B-6-201(2)(a)–(c), (11), (15), (16), (20), (22) (LexisNexis Supp. 2023); *id.* § 76-5-111.4. The court found Defendants and many of their witnesses "to be extremely credible" but found Plaintiffs not "credible at all." Among other things, the court pointed to an email Thomas sent prior to Ruth's move to Utah that contradicted his trial testimony,[6] and the court also stated that portions of Jennifer's testimony "strain[ed] credulity" and contradicted others' testimony. The following is a summary of the court's findings of fact and conclusions of law.

¶14    The court found that Plaintiffs and Ruth's daughter, Sue, conspired "to move Ruth to Utah as part of a scheme to physically separate her from the rest of the family and gain control of who Ruth saw and talked to, when she talked to or saw them and under what circumstances any such contact would occur" in order to "exert some level of influence over her related to her estate planning." The court found they did so without informing

_____

6. At trial, Thomas testified that the initial plan was for Ruth to visit Utah only for a few days and that she decided to stay in Utah shortly after her arrival. But the email Thomas sent to Ruth's estate planning attorney almost a week prior to the trip indicated that Ruth would be moving to Utah and living in an assisted living center near him.

Ruth that she was essentially leaving California for good. The court further found that keeping Ruth "isolated to a significant degree from Defendants and other family and friends" was an integral part of their plan.

¶15   Prior to the move, Ruth loved living in Palos Verdes Estates, had an active social life, and frequently participated in church activities. Family members, including her sister and many of her children, grandchildren, and great-grandchildren, frequently visited her. The trial court found that "Ruth was an integral part of her community in California, she was loved in that community and she loved that community." In California, Ruth was largely self-sufficient, needing only occasional help. She was also looking forward to attending a large Easter get-together planned for the end of March 2016.

¶16   In mid-March 2016, Ruth's daughter, Laura, took Ruth to Ruth's California bank in an unsuccessful attempt to add herself to Ruth's personal account and possibly to remove Thomas from that account. The next day, Sue drove Ruth to Utah with only "the equivalent of an overnight bag." Ruth believed that her Utah visit would last only a few days. After the fact, Sue told one of Ruth's granddaughters, Katie, that she was concerned Ruth had suffered a stroke and she had taken Ruth to see a neurologist in Utah. Katie called Ruth, who told her that Sue had traveled to Utah to accompany her son to a doctor's appointment and Ruth had taken the opportunity to travel with her to visit Ruth's Park City home. There was no evidence that Ruth said goodbye to her friends or church community before leaving or that she told anyone that she was moving to Utah.[7] The court found that Plaintiffs and Sue

---

7. In April 2016, Sue brought Ruth back to California for a short visit with Ruth's sister. None of the other family members were informed that Ruth was back in California, although she did see Laura and Katie because they also happened to pay Ruth's sister a visit at that time.

fabricated the story in order to get Ruth to agree to leave California and that they did not tell Ruth that they intended to move her to Utah permanently.

¶17    In Utah, Ruth was initially placed in an assisted living facility for a short while but was later moved into Plaintiffs' home. There, Ruth stayed in Jennifer's former yoga studio. The entrance to the room had no door, and Ruth slept on a narrow bed that had previously been used for yoga-based healing. Plaintiffs made it a point to be physically present with Ruth as much as possible in order to closely monitor and limit Ruth's contact with her other family, particularly Defendants and Katie. Phone calls, although not altogether prohibited, were rare, short, and of limited subject matter.

¶18    Katie was able to visit Ruth in or around May. Although Ruth seemed to be doing well physically, she told Katie that "she had never been so homesick" and she wanted to return with Katie to California. Ruth's sister passed away shortly after Katie's visit. Ruth did not attend the funeral even though Ruth was "extraordinarily close" with her sister, she "desired very much to attend [the] funeral," and there was no medical or logistical reason that prevented her from doing so.

¶19    In June, Anne and two of her sons visited Ruth, but Thomas refused to allow Ruth to leave his home, claiming to have guardianship over her. This resulted in an argument and the police being called. The trial court found that Anne credibly testified that Ruth appeared "terrified" during the confrontation and that Plaintiffs "were screaming and yelling and Ruth was in a panic" and "looked like a caged animal." Ruth told Anne that she felt lonely and isolated and that she missed her friends and her home. Anne subsequently reported to Adult Protective Services that Ruth was not residing with Plaintiffs willingly.

¶20 In late June or early July, Anne, Dave, and Katie visited Utah, but Plaintiffs would not allow Ruth to spend time with them in the Park City home. Katie was able to visit Ruth twice during the trip but had to schedule the visits in advance with Plaintiffs. Following that trip, Katie tried to schedule phone calls with Ruth, frequently to no avail.

¶21 In October, Anne and Dave again visited Ruth at Plaintiffs' home after hearing from Katie that Ruth was not doing well. Jennifer, who was the only one home with Ruth at the time, again refused to allow Anne and Dave to take Ruth to the Park City home. Another argument ensued, and the police were again called.

¶22 In November, concerned that Ruth would soon die, Katie returned to Utah. She and her children were forced to wait outside of Plaintiffs' home for hours, and they were ultimately unable to see Ruth. Katie found out the following day that Ruth had passed away.

¶23 Based on these findings of fact, the trial court entered conclusions of law. The court first ruled that it had jurisdiction to adjudicate the declaratory judgment action and specifically determined that Plaintiffs had a legally protectible interest in the matter. In so concluding, the court distinguished *Miller v. Weaver*, 2003 UT 12, 66 P.3d 592, stating that in *Miller* "the statute relied upon by plaintiffs did not give rise to an express or implied cause of action," whereas in the current action, "while Plaintiffs have not pointed to any statute or concrete theory under which they have a legally protectible interest, they have been accused by Defendants of elder abuse in two separate courts." The court stated that it therefore followed that "in consideration of the fact that the declaratory relief statute is to be liberally interpreted and administered, Plaintiffs do have a legally protectible interest in a declaration that they have *not* committed elder abuse."

¶24 Turning next to the merits of the action, the court ruled that Plaintiffs committed elder abuse by knowingly harming Ruth, which they did by moving her to Utah and effectively cutting off contact between her and the rest of her family, resulting in emotional distress, mental anguish, hurt, and suffering. *See* Utah Code Ann. § 26B-6-201(2)(a), (17) (LexisNexis Supp. 2023). But the court further concluded that Plaintiffs did not commit elder abuse by isolating Ruth because their actions did not satisfy the strict statutory definition of that term, *see id.* § 26B-6-201(2)(b), (20), nor did they commit elder abuse by emotionally or psychologically abusing Ruth, *see id.* § 26B-6-201(2)(c), nor by neglecting her, *see id.* § 26B-6-201(11), (22). Lastly, the court concluded that there was insufficient evidence to support a finding that Plaintiffs financially exploited Ruth, *see id.* § 26B-6-201(16); *id.* § 76-5-111.4, but the court "expressly except[ed] from its determination at trial any issues pertaining to Ruth's estate planning."

*Attorney Fees*

¶25 Following the trial court's decision, Defendants filed a motion seeking attorney fees and costs. The court granted the motion, ruling that this case satisfied the elements of Utah's bad faith statute. *See* Utah Code Ann. § 78B-5-825(1) (LexisNexis 2022). First, the court found that Defendants were the prevailing parties because Plaintiffs did not obtain the declaratory judgment they sought. Second, the court concluded that the action was without merit because some of Plaintiffs' testimony, specifically regarding the circumstances of Ruth's move to Utah and extended stay, "was not just incredible, but was actual perjured testimony." *See supra* ¶ 13 & note 6. Third, the court found that Plaintiffs brought the action in bad faith. The court again pointed to the perjured testimony, and it also found that "Plaintiffs did not bring this action to clear their names" but rather as "part of a strategy of piecemeal litigation, the purpose of which was to hinder, delay, and defraud Defendants, and which was premised in part on the provision of false testimony." Accordingly, the court ordered

Plaintiffs to pay $876,295.55 in attorney fees and costs to Defendants.

¶26    Plaintiffs appeal.


ISSUES AND STANDARDS OF REVIEW

¶27    Plaintiffs raise two issues that we consider in this appeal. First, they argue that the trial court lacked jurisdiction to enter declaratory judgment on any statutory ground for elder abuse other than that of financial exploitation. "Whether a district court has subject matter jurisdiction is a question of law" that we review for correctness.[8] *Summerhaze Co. v. FDIC*, 2014 UT 28, ¶ 8, 332 P.3d 908 (quotation simplified).

¶28    Second, Plaintiffs challenge the court's award of attorney fees and costs to Defendants under the bad faith statute. "A [prevailing] party is entitled to attorney fees under the bad faith statute when an action or defense is both (1) without merit, and (2) not brought or asserted in good faith." *Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 24, 507 P.3d 357 (quotation simplified). The trial court's "without merit determination is a question of law" that we review for correctness. *Id.* (quotation simplified). But we review the court's factual finding that the action was not brought in good faith for clear error. *Id.* "Furthermore, because the good faith element implicates fact-intensive questions about the losing party's subjective intent,

---

8. Plaintiffs also directly challenge the trial court's ruling that they committed elder abuse under Utah Code section 26B-6-201(2)(a) by knowingly harming Ruth. Because our resolution of the jurisdictional issue is dispositive, we do not reach this additional argument.

a lower court's finding on this element typically will be afforded a substantial measure of discretion." *Id.* (quotation simplified).

ANALYSIS

I. Jurisdiction

¶29 Utah's Declaratory Judgment Act grants district courts "the power to issue declaratory judgments determining rights, status, and other legal relations within its respective jurisdiction" and provides that "[a]n action or proceeding may not be open to objection on the ground that a declaratory judgment or decree is prayed for." Utah Code Ann. § 78B-6-401(1) (LexisNexis 2022). *See Bleazard v. City of Erda*, 2024 UT 17, ¶ 39 ("The Declaratory Judgment Act grants a district court jurisdiction to determine any question of construction or validity of a statute that affects the rights, status, or other legal relations of any person and to declare that person's rights, status, or legal relations under the statute.") (quotation simplified). Nevertheless, "the courts are not a forum for hearing academic contentions or rendering advisory opinions, and therefore all actions must meet the requisite justiciable and jurisdictional requirements of any action." *Williamson I*, 2019 UT App 123, ¶ 11, 447 P.3d 131 (quotation simplified). *See Summit County v. Town of Hideout*, 2024 UT 16, ¶ 32 ("The statutory creation of relief in the form of a declaratory judgment does not create a cause of action or grant jurisdiction to the court where it would not otherwise exist.") (quotation simplified). That is, before an action seeking declaratory judgment may proceed, "(1) there must be a justiciable controversy; (2) the interests of the parties must be adverse; (3) the parties seeking relief must have a legally protectible interest in the controversy; and (4) the issues between the parties must be ripe for judicial determination." *Bleazard*, 2024 UT 17, ¶ 40 (quotation simplified). All four requirements must be satisfied before an action for declaratory judgment may move forward. *See Miller v. Weaver*, 2003 UT 12, ¶ 15, 66 P.3d 592.

¶30 Only the third requirement concerning the parties' legally protectible interests, which goes toward standing, is at issue in this appeal. *See Jenkins v. Swan*, 675 P.2d 1145, 1148 (Utah 1983) (stating that the second and third requirements a plaintiff must satisfy before obtaining declaratory judgment "represent the traditional test for standing"). "Standing is a jurisdictional requirement that must be satisfied before a court may entertain a controversy between two parties." *Kemp v. Wells Fargo Bank*, 2013 UT App 88, ¶ 4, 301 P.3d 23 (quotation simplified). And "generally speaking, a party has an interest that is legally protectible for purposes of standing if it has a claim for relief that emanates from the common law, a statute, or the constitution." *Summit County*, 2024 UT 16, ¶ 34 (quotation simplified). Here, by the time of trial, the sole basis for the trial court's exercise of jurisdiction was Utah's elder abuse statute—the court did not address any common law or constitutional considerations.

¶31 "[W]hen a party's declaratory judgment claim is rooted in statute, not the constitution or common law, a legally protectible interest comes from an express or implied statutory right of action." *Id.* ¶ 35. "A private statutory right of action exists when a private party can bring a lawsuit for relief from injuries caused by another's violation of a statute." *Bleazard*, 2024 UT 17, ¶ 45 (quotation simplified). Whether a private statutory right of action exists presents "a question of statutory interpretation," for which "we look first to the plain language of the statute for an express indication that a private right of action was intended." *Id.* ¶ 46 (quotation simplified). "Such an indication is made clear by explicit language that does not require anyone to add language or make inferences to impart the full meaning of the statute." *Id.* (quotation simplified).

¶32 Furthermore, absent express statutory language granting a private right of action, Utah courts "are reluctant to imply a private right of action based on state law." *Id.* ¶ 47 (quotation simplified). Indeed, "Utah courts have rarely, if ever, found a

Utah statute to grant an implied private right of action." *Id.* (quotation simplified). This reluctance is elevated when an implied private right of action would require courts "to infer language and meaning that does not appear on the face of the statute or when doing so would be inconsistent with the Legislature's statutory scheme," *id.* (quotation simplified), or "when the Legislature has already designated a method of resolution through an administrative agency specifically empowered to handle issues," *Miller*, 2003 UT 12, ¶ 20.

¶33 Utah Code section 26B-6-201 generally defines elder abuse as "abuse, neglect, or exploitation of an elder adult," Utah Code Ann. § 26B-6-201(11) (LexisNexis Supp. 2023), and further divides each of these three categories of elder abuse into subcategories, *id.* § 26B-6-201(2), (16), (22). As relevant here, the "abuse" category includes a subcategory of "knowingly or intentionally" "causing harm." *Id.* § 26B-6-201(2)(a)(ii). Harm, in turn, is defined as "pain, mental anguish, emotional distress, hurt, physical or psychological damage, physical injury, serious physical injury, suffering, or distress inflicted knowingly or intentionally." *Id.* § 26B-6-201(17). Additionally, the "exploitation" category of elder abuse includes three subcategories. *Id.* § 26B-6-201(16). These are personal dignity exploitation of a vulnerable adult, *see id.* § 76-5-111.3, financial exploitation of a vulnerable adult, *see id.* § 76-5-111.4, and sexual exploitation of a vulnerable adult, *see id.* § 76-5b-202. *See also id.* § 26B-6-201(12), (30) (defining "[v]ulnerable adult" as, among other things, an "elder adult," which, in turn, is defined as "an individual 65 years or older").

¶34 Utah Code section 26B-6-213 provides that "[a] vulnerable adult who suffers *harm or financial loss as a result of exploitation* has a private right of action against the perpetrator," and in the event of the vulnerable adult's death, "any cause of action under this section shall constitute an asset of the estate of the vulnerable adult." *Id.* § 26B-6-213(1)–(2) (emphasis added). At issue here is whether the modifier "as a result of exploitation" applies to both

"harm" and "financial loss"—or merely to "financial loss." If the former, then an express private right of action exists only as to elder abuse arising from exploitation that results in harm or financial loss. If the latter, then a private right of action also exists when the victim of elder abuse suffers harm more generally and is not then limited to the exploitation category of elder abuse.

¶35    "Our primary task when interpreting these provisions is to give effect to the intent of the legislature," *Downs v. Thompson*, 2019 UT 63, ¶ 17, 452 P.3d 1101, the "best indication" of which "is the statute's plain language," *Flowell Elec. Ass'n v. Rhodes Pump, LLC*, 2015 UT 87, ¶ 34, 361 P.3d 91. "When looking at the plain language, we presume that the Legislature used each word advisedly, and deem all omissions to be purposeful." *Zilleruelo v. Commodity Transporters, Inc.*, 2022 UT 1, ¶ 19, 506 P.3d 509 (quotation simplified). We also "consider the entire [statutory] text, in view of its structure and of the physical and logical relation of its many parts." *Salt Lake City Corp. v. Haik*, 2020 UT 29, ¶ 15, 466 P.3d 178 (quotation simplified).

¶36    Given the context of the statute at issue, the series-qualifier canon of statutory interpretation is most helpful in resolving this dispute.[9] *See Downs*, 2019 UT 63, ¶¶ 18, 21. It provides that

9. The series-qualifier canon is often in competition with the last-antecedent canon. *Downs v. Thompson*, 2019 UT 63, ¶ 18, 452 P.3d 1101. Under the last antecedent canon, "a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Id.* ¶ 19 (quotation simplified). *See LPI Services v. McGee*, 2009 UT 41, ¶ 15, 215 P.3d 135 ("Under the rule of the last antecedent, qualifying words and phrases are generally regarded as applying to the immediately preceding words, rather than to more remote ones.") (quotation simplified). But "this rule does not prevent us from deciding that qualifying words and phrases apply to several preceding terms of

(continued…)

"[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series." *Id.* ¶ 20 (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012)). The "classic example" of this canon is the Fourth Amendment to the United States Constitution, which protects "against unreasonable searches and seizures." *Downs*, 2019 UT 63, ¶ 20 (quotation simplified). "Applying the series-qualifier canon, we and others read this text as barring both unreasonable searches and unreasonable seizures," that is to say, "both nouns in the series are qualified by the preceding adjective 'unreasonable.'" *Id.* The same principle can apply when the modifier comes after the series. *Id.* When applied to section 26B-6-213(1), the modifier "as a result of exploitation" would thus modify both "harm" and "financial loss," meaning that the private right of action granted under the statute is limited to the exploitation category of elder abuse, more specifically to when the victim suffers harm or financial loss as a result.

¶37 The series-qualifier canon is properly applied to section 26B-6-213(1) because if the modifier "as a result of exploitation" was limited to "financial loss," the modifier would be rendered wholly superfluous, an outcome typically avoided. *See Turner v.*

---

the same character." *LPI Services*, 2009 UT 41, ¶ 15 (quotation simplified). Rather, "context guides which canons we apply." *Downs*, 2019 UT 63, ¶ 18. *See LPI Services*, 2009 UT 41, ¶ 15 ("Rules of statutory construction, such as the rule of the last antecedent, are useful guides, but poor masters, and they should not be regarded as having any such rigidity as to have the force of law, or distort an otherwise natural meaning or intent.") (quotation simplified). For reasons discussed in greater detail below, the series-qualifier canon is more appropriately applied to the statute at issue in this appeal.

*Staker & Parson Cos.,* 2012 UT 30, ¶ 12, 284 P.3d 600 ("Wherever possible, we give effect to every word of a statute, avoiding any interpretation which renders parts or words in a statute inoperative or superfluous.") (quotation simplified). Of the three categories of elder abuse, only that of exploitation contemplates financial loss, *see* Utah Code Ann. § 26B-6-201(16); *id.* § 76-5-111.4, thereby rendering the clarification that the financial loss must result from exploitation entirely unnecessary. Conversely, "harm"—which is the knowing or intentional infliction of "pain, mental anguish, emotional distress, hurt, physical or psychological damage, physical injury, serious physical injury, suffering, or distress," *id.* § 26B-6-201(17)—is not expressly limited to any of the three categories of elder abuse, *see id.* It is also entirely possible for an individual to knowingly or intentionally inflict harm on a vulnerable adult by means of any of the three subcategories of exploitation (personal dignity exploitation, financial exploitation, or sexual exploitation). The modifier "as a result of exploitation" thus serves a purpose only if it applies to both "harm" and "financial loss" and is superfluous if applied only to "financial loss."

¶38    Additionally, the Utah Code provides alternative means to address the other two categories of elder abuse. Adult Protective Services, a unit of the Division of Aging and Adult Services, is statutorily granted the power "to investigate abuse, neglect, and exploitation of vulnerable adults and provide appropriate protective services." *Id.* § 26B-6-201(5). *See id.* §§ 26B-6-202, -205. And it is the duty of the county or district attorney, and in some situations of the attorney general, to assist Adult Protective Services in "initiat[ing] legal proceedings to protect vulnerable adults" and in "tak[ing] appropriate action to prosecute the alleged offenders." *Id.* § 26B-6-208. Accordingly, our interpretation of section 26B-6-213(1) would not leave victims of the abuse or neglect categories of elder abuse without means of

relief—which would clearly be against our Legislature's intent.[10] For these reasons, we hold that the express statutory language of section 26B-6-213(1) limits the private right of action to instances of "harm or financial loss" that were caused "as a result of exploitation."

¶39 Here, following a bench trial, the trial court found that Plaintiffs had committed one form of elder abuse as defined under section 26B-6-201. Specifically, the court determined that Plaintiffs' actions satisfied subsection 201(2)(a) (harm—a subcategory of abuse), but it also determined that their actions did *not* constitute elder abuse under subsections 201(2)(b) (isolation—also a subcategory of abuse), 201(2)(c) (emotional or psychological abuse—also a subcategory of abuse), 201(22) (neglect), or 201(16) (financial exploitation). As discussed above, of these five variants of elder abuse the court considered, only that of financial exploitation fell under the exploitation category of elder abuse, and thus only that allegation carried with it a private right of action. Accordingly, Plaintiffs had a legally protectible interest only as to the determination of whether they financially exploited Ruth between March and November 2016—and the court held that Plaintiffs did not. The court thus exceeded its jurisdiction when it adjudicated the remaining four allegations of elder abuse for which there is no private right of action.

¶40 Defendants resist this conclusion, arguing that "even if Plaintiffs' arguments were to be indulged, it begs the question as to the point of the bench trial."[11] Defendants point to Plaintiffs'

---

10. For this same reason, there is no implied private right of action for elder abuse committed by means of abuse or neglect. *Cf. Miller v. Weaver*, 2003 UT 12, ¶ 20, 66 P.3d 592.

11. Defendants also argue that our holding in this appeal contradicts our prior decision in *Williamson I*, 2019 UT App 123,

(continued…)

complaint, in which Plaintiffs sought a broad declaratory judgment that they "did not commit elder abuse against Ruth," that they "did not violate any statutory or common law duties owed to Ruth," and that Defendants "have no actionable claim against [them] pertaining in any way to Ruth." Defendants also assert that if the trial court had jurisdiction to consider only the issue of financial exploitation, given the court's determination that the question of whether Plaintiffs exerted undue influence in Ruth's estate planning should be reserved for the Probate Action,

---

447 P.3d 131. Specifically, they point to the statement that "the requested declaratory judgment would indeed completely resolve the controversy giving rise to the specific 'proceeding' pending before the court." *Id.* ¶ 16. At issue in *Williamson I* was whether the district court properly dismissed the action under Utah Code section 78B-6-404 and under its common law authority. *Id.* ¶ 13. And in *Williamson I*, we expressly presumed for purposes of that appeal that all four of the threshold requirements for declaratory judgments were met. *See id.* ¶ 12.

Defendants also point to the statement in *Williamson I* that the "judicial power to issue declaratory judgments is broad, and is not constitutionally restricted to cases and controversies." *Id.* ¶ 10 (quotation simplified). However, this argument overlooks the discussion that followed of the four threshold requirements that must nevertheless be met before a court may proceed to adjudicate an action for declaratory judgment. *See id.* ¶ 11. And here, we hold that at least one of those requirements was not met as to four of the five statutory grounds of elder abuse the court considered at trial. Furthermore, as discussed in greater detail below, at the time *Williamson I* was decided, the California elder abuse statute, which provides broader private rights of action than its Utah counterpart, was still potentially in play in the underlying litigation.

"that would have left essentially nothing for the trial court [in the current action] to adjudicate."

¶41   Although Plaintiffs' complaint sought a declaratory judgment that they generally did not commit elder abuse in various forms, by the time of trial those claims had been limited to five statutory grounds of elder abuse under Utah law. Indeed, at the time of the *Williamson I* decision, the potential of California law being applied was still in play. California law, unlike its Utah counterpart, expressly allows private actions against defendants for abuse, neglect, or financial abuse of the elderly where the defendant is also guilty of "recklessness, oppression, fraud, or malice in the commission of [the] abuse." Cal. Welf. & Inst. Code § 15657. Thus, a private right of action likely existed for certain claims of elder abuse that might have been adjudicated under California law. But post-remand, Plaintiffs argued in their motion for summary judgment that Utah law—not California law—should be applied in this case, and Defendants did "not dispute that the substantive law of Utah should apply to the determination of Plaintiffs' declaratory relief claim as they have framed it in the pleadings and subsequently confirmed in discovery." The trial court agreed, and by the time of trial, the court had limited the current action to deciding five alleged *statutory* grounds of elder abuse under Utah law, and it did not consider whether Plaintiffs breached any duties they owed to Ruth under Utah common law. Thus, as the action progressed to trial, the allegations of elder abuse were specifically identified—four of which the trial court lacked jurisdiction to adjudicate.

¶42   Furthermore, on summary judgment, Plaintiffs argued that because the financial exploitation allegation was the sole claim that carried with it a private right of action, the court was limited to considering only that claim at trial. But Defendants convinced the court that the scope of the declaratory judgment action went "beyond" "conduct that gives rise to a private cause of action" under Utah's elder abuse statute and should include "a real broad

cross section of physical, financial elder abuse and exploitation." Thus, while Plaintiffs certainly bear their share of responsibility for some of the inefficiencies in the way this lengthy litigation proceeded, it is Defendants who ultimately prevailed upon the trial court to try claims that we now hold were jurisdictionally infirm.

¶43 In sum, because no private right of action exists for the allegations that Plaintiffs committed elder abuse by harming, neglecting, isolating, or emotionally or psychologically abusing Ruth while she was in Utah, the court exceeded its jurisdiction when it adjudicated those allegations. Accordingly, we vacate the court's rulings on those points. But because a private right of action exists for the allegation that Plaintiffs financially exploited Ruth, the court's ruling that Plaintiffs did not commit that form of elder abuse still stands because Defendants have not challenged it in a cross-appeal.

## II. Attorney Fees

¶44 Under the bad faith statute, "[i]n civil actions, the court shall award reasonable attorney fees to a prevailing party if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith[.]" Utah Code Ann. § 78B-5-825(1) (LexisNexis 2022). Thus, in addition to determining whether the party requesting attorney fees under the bad faith statute is the "prevailing party," *Utah Associated Mun. Power Sys. v. 3 Dimensional Contractors Inc.*, 2024 UT App 35, ¶ 74, 547 P.3d 829, the trial court must also make findings regarding whether the other party's claim or defense was without merit and not brought or asserted in good faith, *id.*; *Pinder v. Duchesne County Sheriff*, 2020 UT 68, ¶ 100, 478 P.3d 610. "A claim [or defense] is without merit if it is frivolous, is of little weight or importance having no basis in law or fact, or clearly lacks a legal basis for recovery." *Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶ 30, 61 P.3d 1009 (quotation simplified). And a party

does not bring a claim or defense in good faith if the party either "(1) lacks an honest belief in the propriety of the activities in question, (2) intends to take unconscionable advantage of others, or (3) intends to or has knowledge of the fact that his actions will hinder, delay, or defraud others." *Id.* ¶ 29.

¶45   Here, the trial court ruled that Defendants were the prevailing parties because Plaintiffs did not obtain the declaratory judgment they sought. The court further ruled that the action was without merit because some of Plaintiffs' testimony was perjured and that Plaintiffs brought the action in bad faith because they did so as "part of a strategy of piecemeal litigation, the purpose of which was to hinder, delay, and defraud Defendants, and which was premised in part on the provision of false testimony." But, as discussed in Part I, of the five statutory grounds for elder abuse that the trial court considered at trial, the court had jurisdiction to adjudicate only whether Plaintiffs financially exploited Ruth, which it addressed in a limited way. Specifically, it considered evidence only from the time Ruth moved to Utah in March 2016 until her death in November 2016, and it "expressly except[ed] from its determination at trial any issues pertaining to Ruth's estate planning." Ultimately, the court ruled in Plaintiffs' favor on that issue, concluding that there was insufficient evidence to find that Plaintiffs financially exploited Ruth during that time. So, on that issue at least, Plaintiffs were the prevailing party. And while we conclude that the trial court lacked jurisdiction to decide the claims that did not give rise to a private right of action, the trial court had determined on the record before it that Plaintiffs had not committed three other variants of elder abuse.

¶46   Given our resolution of the jurisdiction issue in Part I, new issues arise regarding the trial court's award of attorney fees under the bad faith statute. To name a few: whether Defendants are still the prevailing party in the action considered as a whole; whether, given that Plaintiffs prevailed on the only claim that the court had jurisdiction to decide, Plaintiffs' action lacked merit;

and whether Plaintiffs' false testimony, which does not seem to relate to the financial exploitation claim but which did relate to their defense against at least some of the four other claims,[12] can still serve as a basis for the court's findings regarding merit and bad faith.[13] Accordingly, we remand for the trial court to consider anew Defendants' request for attorney fees under the bad faith statute.[14]

---

12. The trial court ruled that *Defendants* carried the burden of proof at trial on all elder abuse claims, which ruling has not been challenged by either party on appeal. Thus, although Plaintiffs argued on summary judgment that a private right of action existed only as to the financial exploitation claim, it is conceivable that Plaintiffs' *defense* at trial against the claims to which the false testimony related may nonetheless have been meritless or in bad faith.

13. We express no opinion on the resolution of these questions. Indeed, questions relating to which side prevailed and good faith are generally left to the discretion of the trial court. *See Maxwell Masonry Restoration & Cleaning LLC v. North Ridge Constr. Inc.*, 2022 UT App 109, ¶ 28, 518 P.3d 164 ("Whether a party is the prevailing party in an action is a decision left to the sound discretion of the trial court and reviewed for an abuse of discretion.") (quotation simplified), *cert. denied*, 525 P.3d 1265 (Utah 2023); *Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 24, 507 P.3d 357 ("Because the good faith element implicates fact-intensive questions about the losing party's subjective intent, a lower court's finding on this element typically will be afforded a substantial measure of discretion.") (quotation simplified).

14. Defendants also seek an award of attorney fees incurred on appeal. "Generally, when a party who received attorney fees below prevails on appeal, the party is also entitled to fees

(continued…)

## CONCLUSION

¶47    Because, by the time of trial, the remaining allegations of elder abuse were based solely on Utah statute, the trial court had jurisdiction to adjudicate only the claims that carried a statutory private right of action. And the only relevant claim with such a private right of action was that of financial exploitation, which the court determined Plaintiffs did not commit. We therefore vacate the court's judgment, except for its financial exploitation ruling in Plaintiffs' favor. We also vacate the court's award of attorney fees to Defendants under the bad faith statute and remand for the trial court to reconsider Defendants' request in light of our resolution of this appeal.

---

reasonably incurred on appeal." *Fadel v. Deseret First Credit Union*, 2017 UT App 165, ¶ 38, 405 P.3d 807 (quotation simplified), *cert. denied*, 409 P.3d 1047 (Utah 2017). This principle likewise "applies when the basis for attorney fees in the trial court is the bad faith statute." *Id.* (quotation simplified). But because we remand the issue of attorney fees for the trial court to consider anew, Defendants' entitlement to attorney fees at the trial court level is yet to be determined. "Thus, any appropriate award of attorney fees on appeal is dependent upon that determination and should be assessed by the district court on remand." *Crank v. Utah Jud. Council*, 2001 UT 8, ¶ 44 n.18, 20 P.3d 307.