**2024 UT App 17**

# THE UTAH COURT OF APPEALS

DAVID HUNTER,
Appellant,
*v.*
MILTON FINAU, GIPPER FINAU, AND KELEPI FINAU,
Appellees.

Opinion
No. 20210864-CA
Filed February 15, 2024

Fourth District Court, Provo Department
The Honorable Robert A. Lund
The Honorable James R. Taylor
No. 210400604

Michael J. Petro and Leah Aston,
Attorneys for Appellant

Stewart O. Peay and John A. Wirthlin,
Attorneys for Appellees

JUDGE RYAN D. TENNEY authored this Opinion, in which JUDGES
GREGORY K. ORME and RYAN M. HARRIS concurred.

TENNEY, Judge:

¶1      In 2007, Kelepi (Gary) Finau created the Finau Corporation, which was intended to facilitate investment into the budding golf careers of his sons, Milton (Tony) and Gipper. That same year, the Finau Corporation entered into two agreements with ICON Sports (ICON) under which ICON gave money to the Finau Corporation in exchange for future earnings and revenues.

¶2      The Finau Corporation was dissolved in 2009. In 2021, David Hunter, the assignee of ICON, sued all three Finaus personally, alleging that they had breached the 2007 agreements by not paying ICON certain monies that they had since earned.

The district court dismissed the suit, however, concluding that the statutes of limitations on the various claims had begun running when the Finau Corporation was dissolved. Hunter now appeals that dismissal. For the reasons set forth below, we affirm.

BACKGROUND[1]

¶3　In 2007, Gary Finau began seeking ways to fund the nascent golf careers of his sons Tony and Gipper. On October 9, Gary signed two related agreements with ICON, a company that was owned at the time by Steve Gasser.

¶4　The first agreement was titled "Loan Agreement." Under this agreement, ICON provided a $495,000 interest-free loan to "the Finau Corporation." The Loan Agreement provided that this loan was to be repaid through "50% of all Finau Corporation revenue and winnings of participant golfers in [the] Finau Corporation." The Loan Agreement also stated that "[i]f for any reason [the] Finau Corporation ceases to exist and/or operate, ICON Sports holds a first position to any funds in [the] Finau Corporation bank account and any future revenue until such loan is paid in full." And it further provided that "[i]f for any reason [the] Finau Corporation ceases to exist and/or operate, ICON Sports holds a first position to any assets of [the] Finau Corporation until such loan is paid in full."

¶5　The second agreement was titled "Equity Interest Purchase," and the parties have since commonly referred to it as "the Equity Agreement." Under the Equity Agreement, ICON purchased a 20% equity position in the Finau Corporation for

---

1. "On appeal from a motion to dismiss, we review the facts only as they are alleged in the complaint. We accept the factual allegations as true and draw all reasonable inferences from those facts in a light most favorable to the plaintiff." *Koerber v. Mismash*, 2013 UT App 266, ¶ 3, 315 P.3d 1053.

$5,000. Under a "Terms and Conditions" provision, ICON agreed that its membership interest was "subject to the Finau Corporation Operating Agreement with the following understandings," among others:

> b. ICON . . . shall have the right to appoint and maintain one seat on the Finau Corporation Board of Directors.
>
> c. [The Finau Corporation] further agrees that all monies, contracts and business properties (outside of player's winnings) shall flow into [the Finau Corporation] for the benefit of the corporation and its members.

¶6 The parties to both the Loan Agreement and the Equity Agreement (collectively, the Agreements) were ICON and the Finau Corporation; none of the Finaus were parties to these agreements in their personal capacities. The Agreements were signed by Gary Finau and Molonai Hola as officers and board members of the Finau Corporation, as well as Gasser as representative of ICON.

¶7 When the Agreements were signed, it was understood that the Finau Corporation would be formed "shortly thereafter," and the corporation was indeed formed within a few months of the execution of the Agreements. Gary, Tony, Gipper, Gasser, and Hola all served as either officers or directors of the Finau Corporation. Sometime in 2009, the Finau Corporation was dissolved. There were five board members at the time. All three Finaus voted in favor of dissolution, while Gasser and Hola opposed it.

¶8 As alleged in the complaint, Tony later became "one of the highest ranked golf players in the world" and "[b]oth Tony and Gipper have now enjoyed substantial professional success and

have earned substantial amounts of money." But the complaint and the record are silent about when, exactly, that happened.

¶9 In the meantime, ICON's interest in the Agreements changed hands several times. Gasser passed away in 2010. At some point before May 9, 2015, David Hunter obtained a minority portion of ICON's interest; in April 2021, Hunter obtained the remainder of ICON's interest.

¶10 On May 9, 2015, Hunter called Tony to "discuss[]" Tony's "obligations" under the Agreements. During that call, Tony informed Hunter that he would not pay the $495,000 loan amount or fulfill any of the "obligations" set forth in the Equity Agreement. And, according to Hunter, the Finaus subsequently refused multiple attempts to settle the dispute regarding Hunter's claims.

¶11 On May 6, 2021, Hunter filed this lawsuit naming Gary, Tony, and Gipper as defendants in their individual capacities. Hunter pleaded five causes of action: (1) fraud in the inducement, (2) breach of contract, (3) breach of the covenant of good faith and fair dealing, (4) unjust enrichment, and (5) promissory estoppel.

¶12 The Finaus responded by filing a motion to dismiss, arguing, among others, that Hunter's claims were all barred by the applicable statutes of limitations. The district court subsequently granted that motion and dismissed all of the claims with prejudice. In its ruling, the court opined that "[u]pon Defendants' dissolution of the Finau Corporation, and considering how Mr. Gasser structured the Agreements to flow through the Finau Corporation, Mr. Gasser knew or should have known that Defendants and [the] Finau Corporation had no intention to repay ICON Sports and fulfill the obligations under the Agreements." The court then concluded that "the dissolution of the Finau Corporation triggered the statute of limitations for Plaintiff (or Mr. Gasser) to seek relief under the Agreements." Because "the breach of contract claim carries the longest statute of

limitations of six (6) years," and because Hunter didn't file his complaint until May 2021, a full 12 years after the 2009 dissolution, the court ruled that all of the claims were time-barred.

¶13   Hunter now appeals.

ISSUE AND STANDARD OF REVIEW

¶14   On appeal, Hunter raises a partial challenge to the district court's decision granting the Finaus' motion to dismiss. In particular, Hunter challenges the dismissal of three of his five causes of action.[2] We review the district court's decision for

---

2. In his brief, Hunter made no separate arguments regarding the court's dismissal of his fraud in the inducement and promissory estoppel claims, instead focusing his challenge on the court's decision to dismiss his claims for breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment. In a few places in his opening and reply briefs, however, Hunter did more broadly request reversal of the "dismissal of [his] complaint" without qualification. If those requests were meant as challenges to the dismissal of the fraud in the inducement and promissory estoppel claims, Hunter has failed to carry his burden of persuading us that there was any error. We thus affirm their dismissal.

Also, with respect to the three claims that are at issue, the parties dispute whether the Finaus can be held personally liable. But the district court did not rule on this basis, instead dismissing the claims on statute of limitations grounds alone. Because we affirm that conclusion, we need not make any definitive ruling on the Finaus' alternative argument that they cannot be held personally liable for violating the Agreements, although we comment indirectly on this subject as it concerns the running of the statute of limitations. *See infra* note 4.

correctness. *See Zubiate v. American Family Ins.*, 2022 UT App 144, ¶ 9, 524 P.3d 148.

ANALYSIS

¶15 On appeal, Hunter challenges the court's dismissal of his claims for breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment. For the reasons set forth below, we conclude that the court correctly dismissed each of those claims.

¶16 "As a general rule, a statute of limitations begins to run upon the happening of the last event necessary to complete the cause of action." *Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, ¶ 20, 108 P.3d 741 (quotation simplified). Under the "discovery rule," however, a statute of limitations may be tolled "until the discovery of facts forming the basis for the cause of action." *Id.* ¶ 21 (quotation simplified). Statutes of limitations serve an important purpose in our system. They "are intended to prevent unfair dilatory litigation against a defendant and to require that claims be litigated while proper investigation and preservation of evidence can occur." *Vigos v. Mountainland Builders, Inc.*, 2000 UT 2, ¶ 22, 993 P.2d 207. They likewise discourage "unfair litigation," such as through suits based on "stale claims." *Id.* And they also work to "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Russell Packard*, 2005 UT 14, ¶ 28 (quotation simplified).

A.     Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing

¶17 We first address Hunter's arguments regarding his claims for breach of contract and breach of the covenant of good faith and fair dealing. "An implied covenant of good faith and fair dealing

inheres in every contract," and a "violation of the covenant is a breach of the contract." *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 14, 94 P.3d 193. Under "the covenant of good faith and fair dealing, both parties to a contract impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract." *Id*.

¶18 The statute of limitations for an "action" "upon any contract" is six years. Utah Code § 78B-2-309(1)(b). "In a breach of contract action[,] the statute of limitations ordinarily begins to run when the breach occurs." *Clarke v. Living Scriptures, Inc.*, 2005 UT App 225, ¶ 9, 114 P.3d 602 (quotation simplified).

¶19 The district court concluded that "the dissolution of the Finau Corporation triggered the statute of limitations for Plaintiff (or Mr. Gasser) to seek relief under the Agreements." Hunter challenges this conclusion on appeal, arguing that the Agreements (and, by extension, the covenant of good faith and fair dealing) were not breached until the Finaus began to earn money from their professional golf careers. Because there has been no discovery yet on when, exactly, that occurred, he argues that dismissal was inappropriate at this procedural stage.

¶20 We disagree. The plain language of the Agreements placed the Finau Corporation into a central role in the parties' contractual relationship, and in light of this, Hunter's complaint alleged that the dissolution of the Finau Corporation constituted the breaches at issue.

¶21 We begin with the plain language of the Equity Agreement. That agreement states that ICON's membership interest in the Finau Corporation was subject to the understanding that "all monies, contracts and business properties (outside of player's winnings) shall flow into [the Finau Corporation] for the benefit of the corporation and its members." Once the Finau Corporation ceased to exist, however, there was nowhere for any monies to "flow into"—which meant, by

extension, that ICON would have no way of recouping its investment.[3]

¶22 A similar dynamic was in play with respect to the language of the Loan Agreement. As a no-interest loan, its key clause is its repayment clause. And that clause provides for the automatic transfer of "50% of all Finau Corporation revenue and winnings of participant golfers in [the] Finau Corporation" into an escrow account "to pay the ICON Sports loan." When the Finau Corporation was dissolved, however, there was no longer any prospect of incoming corporate revenue, nor could there be any revenue from "participant golfers in [the] Finau Corporation." As a result, it had now become impossible for ICON to be repaid under the terms set forth in that agreement.[4]

---

3. The Equity Agreement also provides that ICON's membership interest was subject to "the Finau Corporation Operating Agreement," a document that is not in the record. The Loan Agreement is impliedly (though not explicitly) governed by the same document. Hunter argues that this document must be examined through discovery in order to fully understand the Agreements. We disagree. Whatever further nuances might be revealed by the Operating Agreement, the plain language of the Agreements and Hunter's complaint show that the purposes of the Agreements were defeated by the dissolution of the Finau Corporation.

4. The Loan Agreement also stated that if the "Finau Corporation ceases to exist and/or operate," ICON would have "a first position to any funds in [the] Finau Corporation bank account," "any assets of [the] Finau Corporation," and "any future revenue" until the loan was paid in full. At oral argument, Hunter made much of the term "any future revenue," suggesting that it implied an alternate repayment scheme wherein the Finaus' future golf

(continued…)

¶23 Thus, the plain language of the Agreements placed the Finau Corporation into a key position within the parties' contractual arrangement. Given this, Hunter likewise focused on the corporation's dissolution as a key feature of his complaint—

---

winnings would continue to flow directly to ICON until the loan was paid.

But the Loan Agreement doesn't say this. Rather, it says that repayment would occur through "winnings of participant golfers in [the] Finau Corporation"; since the Finau Corporation no longer existed after 2009, the plain language of this agreement therefore did not entitle ICON to any earnings from the Finaus— who were no longer "participant golfers in [the] Finau Corporation"—moving forward. More broadly, the provisions at issue simply established ICON as a secured creditor in the wind-up and dissolution of the Finau Corporation. And while these provisions entitled ICON to first position with respect to the Finau Corporation's "funds," "assets," and "future revenue," they said nothing about ICON having any entitlement to the winnings, moving forward, from golfers no longer affiliated with the Finau Corporation or from the Finaus personally. We thus disagree with Hunter's suggestion that these wind-up provisions entitled ICON to the earnings of the Finaus individually after the dissolution of the Finau Corporation, and we likewise disagree with his suggestion that they somehow meant that the applicable statutes of limitations did not start running at dissolution of the corporation itself.

In a related vein, Hunter suggests that even if "the continued operation of the Finau Corporation was a condition of the Loan Agreement," that requirement was "severable from the contractual provision requiring loan repayment." But Hunter bases this claim on his unsupported assertion that the Loan Agreement granted ICON "a first place position to *any* future winnings of Tony and Gipper Finau" individually. (Emphasis added.) Because we see no basis for that conclusion, we reject Hunter's severability argument as well.

both broadly, and, more particularly, with respect to the causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. Before pleading these causes of action, Hunter pleaded the following facts in the earlier portions of his complaint:

1. "It was the intent of the parties—and an express term of the Loan Agreement—that *The Finau Corporation would repay* to ICON Sports the amount of $495,000." (Emphasis added.)

2. "An express condition of the Equity Purchase Agreement was that all monies, contracts, and business properties outside of player's winnings would flow *into The Finau Corporation* for the benefit of the Finau Corporation and its members." (Emphasis added.)

3. "It was understood by the Parties, including Tony and Gipper, that all of Tony and Gippers' [sic] earned monies, contracts, and business properties *for the duration of their professional careers* would flow *into the Finau Corporation* in perpetuity." (Emphases added.)

4. "[I]nstead of flowing all monies, contracts, and business properties *through The Finau Corporation*, as was required under the Equity Purchase Agreement, the Finau's [sic] voted to dissolve The Finau Corporation." (Emphasis added.)

5. Dissolution was "a deliberate attempt to avoid paying the 20% equity due under the Equity Purchase Agreement."

6. "*Dissolution of The Finau Corporation was contrary to the Parties' intent* when the Equity Purchase Agreement was entered into . . . ." (Emphasis added.)

7. "The Finaus dissolved The Finau Corporation in a deliberate attempt to avoid having to pay ICON Sports a 20% interest in Tony and Gipper's earnings under the Equity Purchase Agreement."

8. "Had the Finaus revealed that they had no intention of repaying the $495,000 loan and no intention of actually selling a 20% interest in Tony and Gipper's professional earnings in perpetuity, *or in running those earnings through The Finau Corporation in perpetuity*, ICON Sports would not have entered into the Loan Agreement or Equity Purchase agreement." (Emphasis added.)

¶24    The district court relied on these asserted facts as a basis for its ruling, and we do as well. Both individually and collectively, these alleged facts demonstrate that the continued existence of the Finau Corporation was a key component of the Agreements and the parties' expectations when entering into them. If it's true, as Hunter alleged in his complaint, that the "express" terms of the Agreements directly provided for ICON to be repaid through the monies earned by the Finau Corporation, and if it's true that it was "understood by the Parties" that "all of Tony and Gippers' [sic] earned monies, contracts, and business properties for the duration of their professional careers would flow into the Finau Corporation in perpetuity," and if it's also true that the Finaus' subsequent dissolution of the Finau Corporation was a "deliberate attempt" to avoid paying what was owed under the Equity Agreement in particular, then it would be true that the dissolution of the Finau Corporation constituted a breach of the Agreements that effectively rendered continued performance of the contracts impossible.

¶25    Hunter pleaded a single cause of action for breach of contract, wherein he addressed both the Equity Agreement and the Loan Agreement. At the outset of that cause of action, Hunter "reallege[d] and incorporate[d] by reference all of the preceding

paragraphs" from the earlier portions of his complaint. From there, he alleged, among other things, that an "express condition of the Equity Purchase Agreement was that all monies . . . (outside of player's winnings) would flow into The Finau Corporation for the benefit of The Finau Corporation and its members" and that the Finaus had breached the Equity Agreement "by failing to flow all of Tony and Gippers' [sic] monies, contracts, and business properties into the Finau Corporation for the benefit of the Finau Corporation and its members." And with respect to the Loan Agreement, Hunter alleged that the Finaus had breached it "by failing to repay the loan amount of $495,000 under the terms of the contract." As noted, the terms of the contract guaranteed repayment through "50% of all Finau Corporation revenue and winnings of participant golfers in [the] Finau Corporation." And again, Hunter had alleged earlier in the complaint that "an express term of the Loan Agreement" was that the "Finau Corporation would repay to [ICON] the amount of $495,000." Thus, Hunter's cause of action for breach of contract pointed to the dissolution of the Finau Corporation as being a breach of the Agreements.

¶26 Hunter was even clearer about this in his cause of action for breach of the implied covenant of good faith and fair dealing. There, he alleged that the "Loan Agreement . . . anticipated and required that Tony and Gipper's monies flow through the Finau Corporation." He alleged that the Equity Agreement "also anticipated and required that all of Tony and Gipper's monies flow through The Finau Corporation in perpetuity." And he then alleged that the Finaus "took deliberate and calculated steps to dissolve the Finau Corporation just two years later" "in an attempt to avoid repayment of the loan and payment of the 20% equity interest." He then specifically alleged that these actions constituted a breach of the covenant of good faith and fair dealing.

¶27 In light of all this, we agree with the district court that if there was a breach of the Agreements or a breach of the implied

covenant, any such breach occurred when the Finau Corporation was dissolved. As a result, that's when the statute of limitations began running.

¶28    Hunter assails this conclusion on two principal grounds, but we find neither availing.

¶29    First, Hunter suggests that we should not use all of the above facts from his complaint as part of our analysis. But "our law of civil procedure has long deferred to the plaintiff as the master of the complaint. . . . We judges are neutral arbiters—not advocates. To police that distinction we keep ourselves out of the business of second-guessing the pleading decisions of the parties." *Utah Stream Access Coal. v. VR Acquisitions, LLC*, 2019 UT 7, ¶ 41, 439 P.3d 593 (quotation simplified). This is largely why courts "accept the factual allegations" from the complaint as true when considering a motion to dismiss. *Koerber v. Mismash*, 2013 UT App 266, ¶ 3, 315 P.3d 1053 (quotation simplified).

¶30    The first six facts from the numbered list above were alleged in Hunter's general "Statement of Facts," and Hunter realleged them at the outset of these causes of action, so they are appropriately accepted as true for purposes of our analysis. And while the seventh and eighth facts from that list were pleaded under his fraud in the inducement cause of action, that was Hunter's first-listed cause of action, and in both the breach of contract and breach of covenant causes of action, Hunter "reallege[d] and incorporate[d] by . . . reference all of the preceding paragraphs as though fully set forth below." Thus, by Hunter's own framing, those facts are appropriately considered to be true.

¶31    Second, Hunter argues that dissolution of the Finau Corporation constituted "at most" an anticipatory breach. From this, he suggests that the statute of limitations clock did not start running until an actual breach occurred.

¶32   The problem with this argument is that it was not preserved for review on appeal. Below, Hunter argued that payment under the Agreements was subject to a "condition precedent"—namely, the Finaus earning money from professional golf—and that this "condition precedent" did not occur until some point after 2009. But condition precedent and anticipatory breach are distinct legal theories. A condition precedent is "an event, not certain to occur, which must occur before performance under a contract becomes due." *Palmer v. Allstate Fire & Cas. Ins.*, 2022 UT App 4, ¶ 17, 505 P.3d 517 (quotation simplified); *see also Skolnick v. Exodus Healthcare Network, PLLC*, 2018 UT App 209, ¶ 15, 437 P.3d 584. The condition can fall—and, indeed, in some non-Utah jurisdictions, must fall—outside of the control of either of the parties. 17A Am. Jur. 2d *Contracts* § 447 (2024). Anticipatory breach, on the other hand, occurs where one party "manifests a positive and unequivocal intent not to render performance when the time fixed for performance is due." *Jessup v. Five Star Franchising LLC*, 2022 UT App 86, ¶ 36, 515 P.3d 466 (quotation simplified). Thus, a condition precedent analysis looks to whether an event has occurred that would trigger a party's contractual obligations; by contrast, an anticipatory breach analysis looks to whether an already-obligated party has done something to indicate that it no longer intends to comply with its contractual obligations.

¶33   In addition to being focused on different events, these doctrines differ as to the nature and timing of the remedies. A party who is wronged by an anticipatory breach has a choice whether to sue immediately or to "[t]reat the contract as still binding and wait until the time arrived for its performance and at such time bring an action on the contract." *Hurwitz v. David K. Richards & Co.*, 436 P.2d 794, 796 (Utah 1968). By contrast, "where the duty of the obligor to perform is contingent upon the occurrence or existence of a condition precedent, the obligee may not require performance by the obligor, because the obligor's duty, and conversely the obligee's right to demand performance,

does not arise until that condition occurs or exists." *Harper v. Great Salt Lake Council, Inc.*, 1999 UT 34, ¶ 14, 976 P.2d 1213.

¶34 "This court's preservation requirement is well-settled. An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on that issue." *Horne v. Horne*, 2022 UT App 54, ¶ 10, 511 P.3d 1174 (quotation simplified). And to "provide the court with this opportunity, the issue must be specifically raised by the party asserting error, in a timely manner, and must be supported by evidence and relevant legal authority." *Id.* (quotation simplified). "The fact that the court makes a ruling on [an] overarching" motion "does not, by itself, preserve unmentioned theories of opposition for our review." *Jessup*, 2022 UT App 86, ¶ 31.

¶35 Here, Hunter argued below that the Finaus' future golf earnings were a condition precedent for the Agreements. But he did not separately argue that the Finaus anticipatorily breached those contracts by dissolving the Finau Corporation. Because he did not preserve this distinct legal theory by giving the district court an opportunity to rule on it, we have no occasion to reach it.

¶36 In short, the plain language of the Agreements and the allegations of Hunter's complaint all indicate that the breaches, if any, occurred when the Finaus dissolved the Finau Corporation. Because that dissolution occurred in 2009, and because Hunter did not file his suit until 2021, the district court correctly concluded that these causes of action were time-barred.

B.     Unjust Enrichment

¶37 Hunter also appeals the dismissal of his claim for unjust enrichment, which he pleaded below as an alternative to his contract claims. But, as with the contract claims, the statute of limitations for the unjust enrichment claim began to run with the dissolution of the Finau Corporation in 2009.

¶38　The elements of an unjust enrichment claim are that the "defendant (1) received a benefit, (2) appreciated or had knowledge of this benefit, and (3) retained the benefit under circumstances that would make it unjust for the defendant to do so." *Jones v. Mackey Price Thompson & Ostler*, 2015 UT 60, ¶ 45, 355 P.3d 1000 (quotation simplified). The statute of limitations on a claim for unjust enrichment is four years. *See* Utah Code § 78B-2-307(1)(a); *Pero v. Knowlden*, 2014 UT App 220, ¶ 16, 336 P.3d 55.

¶39　In his complaint, Hunter alleged that the Finaus were unjustly enriched as a result of "wrongfully taking $495,000 as a loan without repayment" and "taking $5,000 for consideration under" the Equity Agreement. The event that would render retention of these benefits "unjust" was the Finaus' decision to dissolve the Finau Corporation, thereby ensuring that ICON would not be repaid under the terms of the Agreements. Thus, for largely the same reasons discussed above with respect to the breach of contract and breach of covenant claims, the statute of limitations for the unjust enrichment claim began running at the time of dissolution. So by the time that Hunter filed suit in 2021, it was eight years too late. The district court correctly dismissed this claim.

C.　Discovery Rule

¶40　Finally, Hunter argues that the discovery rule tolled the statute of limitations for each of the claims at issue. We disagree.

¶41　Where a particular "statute of limitations lacks a statutory discovery rule," the statute of limitations may still be tolled under the equitable discovery rule. *Russell Packard*, 2005 UT 14, ¶ 25. The equitable discovery rule has two branches, applying (1) "where a plaintiff does not become aware of the cause of action because of the defendant's concealment or misleading conduct" (the concealment branch), and (2) "where the case presents exceptional circumstances and the application of the general rule would be irrational or unjust, regardless of any showing that the

defendant has prevented the discovery of the cause of action" (the exceptional circumstances branch). *Id*. (quotation simplified).

¶42    Both branches require a showing that "the plaintiff neither discovered nor reasonably should have discovered the facts underlying the cause of action before the limitations period expired." *Id*. ¶ 29 (a concealment case); *accord Warren v. Provo City Corp.*, 838 P.2d 1125, 1129 (Utah 1992) (an exceptional circumstances case). Under the exceptional circumstances branch, after the plaintiff makes the initial showing, a court will apply a "balancing test to evaluate whether the application of the discovery rule would be irrational or unjust." *Klinger v. Kightly*, 791 P.2d 868, 872 (Utah 1990). Pursuant to this balancing, the equitable discovery rule applies where "the hardship the statute of limitations would impose on the plaintiff in the circumstances of the case outweigh[s] any prejudice to the defendant from difficulties of proof caused by the passage of time." *Id*. (quotation simplified).[5]

¶43    It is not entirely clear from the briefing which branch of the equitable discovery rule Hunter is invoking. But the gravamen of his claim is clear. According to Hunter, after the Finaus dissolved the Finau Corporation, he and his predecessors lacked the ability to "determine when the Finaus had golf winnings and monies that would trigger obligations under the contract." In Hunter's view, he had no reason to believe that the Finaus were "refus[ing] to pay their obligations under the contracts" until the phone call he had

---

5. There is a further wrinkle to the concealment branch. A plaintiff may argue that the statute of limitations should toll even though the plaintiff "knew or reasonably should have known of the facts underlying" the cause of action if the plaintiff can also show that "a reasonably diligent plaintiff would not necessarily have filed a complaint within the limitations period." *Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, ¶ 30, 108 P.3d 741. Hunter did not raise that argument here, so we do not address it.

with Tony on May 9, 2015. And since the suit was filed within six years of that call, Hunter argues that his contract-based claims should survive under the equitable discovery rule.

¶44    But as explained above, the language of the Agreements and the facts alleged in Hunter's own complaint point to the dissolution of the Finau Corporation as the breach. Hunter has not argued, and he cannot plausibly argue, that he or his predecessors were unaware of that dissolution—particularly given that his predecessor (Gasser) was present at the board meeting where the vote for dissolution occurred. As a result, whether this is viewed as a concealment case or an exceptional circumstances case, the equitable discovery rule did not toll the running of any applicable statute of limitations.

## CONCLUSION

¶45    Based on the allegations as pleaded in his own complaint, the statute of limitations for each of Hunter's claims began to run in 2009, and we see no basis for concluding that those statutes were tolled. Since Hunter did not file his suit until 2021, the district court correctly dismissed each of the claims.

¶46    Affirmed.

_____