**2025 UT App 183**

### THE UTAH COURT OF APPEALS

CWS, LLC,
Appellant and Cross-appellee,

*v.*

SCOTT MONTGOMERY,
Appellee and Cross-appellant.

Opinion
No. 20231083-CA
Filed December 11, 2025

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 200903219

Justin T. Toth, Beth J. Ranschau, and Whitney Hulet
Krogue, Attorneys for Appellant and Cross-appellee

Erik A. Olson, Christopher D. Ballard, and Anikka
Hoidal, Attorneys for Appellee and Cross-appellant

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and
DAVID N. MORTENSEN concurred.

ORME, Judge:

¶1    During Scott Montgomery's tenure as manager of CWS, LLC—a commercial and residential window distributor—he deferred his compensation and created a competing business. After his management was called into question, Montgomery was removed. CWS sued Montgomery, claiming he breached CWS's Operating Agreement by participating in the competing business. Montgomery counterclaimed for his deferred compensation. The trial court granted partial summary judgment in Montgomery's favor on his counterclaim. After a trial on CWS's claims, the jury found Montgomery had breached CWS's Operating Agreement through the competing business. Both parties were awarded

damages and prejudgment interest. And the trial court awarded CWS attorney fees, concluding it was the prevailing party.

¶2 On appeal, CWS raises several issues with the trial court's grant of summary judgment to Montgomery. Montgomery cross-appeals, arguing CWS was entitled to neither prejudgment interest on its damages nor attorney fees. We conclude that summary judgment in Montgomery's favor was appropriate and affirm. And we conclude the prejudgment interest award was appropriate on one portion of CWS's damages but not the other. Accordingly, we remand this matter for determination of an appropriate prejudgment interest award. Finally, we reverse and remand for the trial court to reassess attorney fees.

BACKGROUND

¶3 Montgomery and David Robison formed CWS in August 2006. CWS's Operating Agreement, which was signed in March 2007, stated that the purpose of CWS is "to engage in the retail sales and service of residential and commercial windows, doors, and other related products as a manufacturer's dealer and/or distributor representing multiple manufacturers." The Operating Agreement appointed Montgomery as the "initial Manager" of CWS. In that capacity, section 5.9(a) required Montgomery to "cause [CWS] to," among other things, "[p]ay its own liabilities, indebtedness and obligations out of its own assets as the same shall become due" and "[p]ay the salaries of its own employees." Section 5.1(a) granted Montgomery, as Manager, "the right to take any and all such actions on behalf of" CWS as he, in his "sole discretion," deemed "necessary, desirable or advisable in respect of the operation of the Company . . . including, without limitation, any other actions not inconsistent with the character of the Business (interpreted in the broadest manner)." And under section 5.2, Montgomery had "the exclusive and complete power, authority and discretion to manage, control and make all decisions regarding the Business." Despite this broad power,

section 5.1(b) required "the approval of Members owning more than fifty percent (50%) of the total Membership Percentages" before the Manager could, among other things, change the company purpose, act "in contravention of" the Operating Agreement, or change "the terms of employment or compensation of any Manager or Member."

¶4    Exhibit B of the Operating Agreement stated that as Manager, Montgomery would receive a salary of $150,000 per year and a "bonus equal to one and one half percent (1.5%)" of gross revenue exceeding $10 million. The terms dictated that the salary "shall be paid to the Manager through [CWS's] regular payroll, with the annual amount divided into equal payments according to the number of payroll periods." The bonus was to be "computed and paid to the Manager each quarter of each fiscal year," with the exception of the fourth quarter bonus, which was to be "re-calculated for the entire fiscal year" and "paid based on this recalculation."

¶5    Section 1.10(b) of the Operating Agreement prohibited members and the Manager from participating in "Competing Activities," defined in Article II of the Operating Agreement as "participation of any kind in the ownership or operation of a business (other than as operated by [CWS]) in the Territory which is engaged, directly or indirectly, in whole or in substantial part in the Company Purposes." And section 5.6 of the Operating Agreement provided that CWS's remedy for a member's or the Manager's engagement in "Competing Activities" was "the right in, or to, such other ventures or activities and to the income and proceeds derived from any such violative actions."

¶6    When Montgomery and Robison formed CWS, they each owned a 50% membership interest. But in 2012, they each surrendered 5% of their interest to Lou Swaringen, leaving Montgomery and Robison with 45% each and Swaringen with a 10% membership interest in CWS.

¶7 Montgomery was Manager of CWS from 2007 to 2019. He later claimed that beginning in 2007, he made periodic decisions to "defer" his salary and bonus compensation "so as to increase the available cash flow of CWS for the benefit of its members, and otherwise in furtherance of the purposes of the company." In 2014, however, Montgomery set about doing something much less beneficial to CWS: he formed Capitol Commercial Glazing (Capitol), a business that manufactured and installed storefront windows. CWS apparently treated Capitol as one of the window manufacturers it contracted with, displaying Capitol's products in its showroom. Capitol used CWS assets and employees in its operations. And Swaringen later stated that he believed Capitol was part of CWS.

¶8 Robison eventually became concerned about Montgomery's management of CWS. And after Robison discovered Montgomery's involvement in various other personal and commercial entities, including Capitol, Robison and Swaringen removed Montgomery as Manager in 2019. CWS then made demands for payment from Montgomery on various losses he had caused the business, which the parties later referred to as "line-item damages."[1] Montgomery tendered payment for these line-item damages, later stating that the tender was made "[i]n full settlement of the dispute[s]" "but without admitting any personal responsibility" or "admitting any liability." CWS refused to accept this tender, apparently claiming Montgomery owed more than he was offering.

---

1. These "line-item damages" included a loan Montgomery purportedly made from CWS to another entity he controlled during his time as Manager, payments CWS made on machinery purchased by another entity Montgomery was involved with, CWS's allegedly improper hiring of Montgomery's family member, and a dispute over several vehicles.

¶9      CWS filed suit against Montgomery in May 2020, alleging several claims, including breach of contract for creating Capitol—a "Competing Activity" as defined in the Operating Agreement. Montgomery counterclaimed, arguing CWS had breached the Operating Agreement in failing to pay him about $1.8 million in "deferred" salary and bonuses after he was removed as Manager of CWS.

¶10      Montgomery moved for partial summary judgment on several of CWS's claims and his breach of contract counterclaim. CWS opposed Montgomery's motion, arguing that his "deferred compensation" was a change to the compensation structure under the Operating Agreement, which required the approval of membership interests exceeding 50%. CWS also argued that the Operating Agreement clearly laid out Montgomery's duties to pay himself according to the specified schedule. CWS further urged that Montgomery's injury was self-inflicted, he lacked standing, he failed to mitigate damages, and his damages claim was "severely limited by the applicable statute of limitations."

¶11      At the hearing on the motion for partial summary judgment, Montgomery argued that Capitol was not a "Competing Activity" and that he was entitled to his earned but unpaid compensation. Montgomery asserted that he "deferred because he felt the company's cash flow required him not to take this compensation" and he decided "to kick it down the road when the company could afford it." Montgomery's counsel argued, "[T]he amounts he deferred are completely undisputed. There's no dispute there. We're talking about $1.5 million"—though Montgomery had initially raised a different figure in his counterclaim. And noting that CWS had proposed "a slight tweak of a few dollars" in its calculation of compensation owed to Montgomery, his counsel then stated Montgomery would "go along with that."

¶12   In its order on the motion, the trial court denied summary judgment to Montgomery on CWS's claims, concluding that there were "disputed issues of material facts that prevent[ed] the granting of summary judgment," including whether Capitol was a "Competing Activity." But the court granted partial summary judgment in Montgomery's favor on his counterclaim for unpaid compensation, stating, "The issue of compensation was not disputed by [CWS], but on the amount owed," and, "As [Montgomery] conceded at the hearing to accept the amount [CWS] agreed was owed, [Montgomery] is granted judgment thereon."

¶13   The case then proceeded to trial on CWS's claims. Just before trial, Montgomery again attempted to tender payment to CWS for some of the line-item damages, offering $249,907. This time, CWS accepted the tender and dropped its claim for the line-item damages.

¶14   At trial, the parties stipulated to several facts. As relevant here, one such fact was that Montgomery had personally contributed $360,000 to Capitol. Another was that Montgomery received $667,601—$257,243 in 2017, $343,358 in 2018, and $67,000 in 2019—in distributions from Capitol. The parties further stipulated that Montgomery earned $1,502,000 for the sale of his interest in Capitol in April 2019. Based on these stipulated facts, the parties presented varying theories of damages. CWS's expert presented two different damages calculations: "loss theory number 1," which was "based off the sales price of [Capitol] and funds that came out of the company to the . . . listed owners," and "loss theory number 2," which was "based off of future earnings." Montgomery's expert presented a damages theory which accounted for $667,601 in distributions and $1,502,000 from the sale of Montgomery's interest in Capitol and subtracted Montgomery's $360,000 in capital contributions to Capitol, resulting in damages to CWS of $1,809,601.

¶15 As memorialized on a special verdict form, the jury found that Montgomery "breached Section 1.10(b) of the CWS Operating Agreement with regard to Capitol." And the jury found that CWS suffered damages as a result of Montgomery's breach in the amount of $1,809,601, consistent with Montgomery's theory of damages.

¶16 Soon after trial, Montgomery and CWS filed competing motions for their respective attorney fees and costs pursuant to section 7.3 of the Operating Agreement, which stated, "If [CWS] or any Member obtains a judgment against a Member or [CWS] by reason of breach of this Agreement or failure to comply with the provisions hereof, the prevailing party's reasonable attorneys' fees as fixed by the court shall be included in such judgment." In a terse ruling unsupported by factual findings, the court determined that Montgomery "did not prevail and is not entitled to his attorney fees. [CWS] shall be awarded their fees."

¶17 In an amended judgment, the court awarded Montgomery $1,859,080 in damages for his unpaid compensation claim, along with prejudgment interest at the rate of 10%. The court then awarded CWS $1,809,601 on its breach of contract claim for Montgomery's operation of Capitol, along with prejudgment interest at the rate of 10% on the following amounts, for a total judgment of $2,169,601:

> $257,243—from December 31, 2017, to entry of judgment

> $343,358—from December 31, 2018, to entry of judgment

> $67,000—from April 1, 2019, to entry of judgment

> $1,502,000—from April 1, 2019, to entry of judgment

Recognizing Montgomery's pre-trial payment of $249,907 for the line-item damages, the court also awarded CWS 10% prejudgment interest "from May 8, 2020, the date CWS filed its action against Montgomery, to October 27, 2023, the date Montgomery tendered a check for those damages." Finally, the court awarded CWS its attorney fees.

¶18 CWS appeals, and Montgomery cross-appeals.

ISSUES AND STANDARDS OF REVIEW

¶19 CWS raises several challenges to the trial court's grant of partial summary judgment to Montgomery. "Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Desert Mountain Gold LLC v. Amnor Energy Corp.*, 2017 UT App 218, ¶ 11, 409 P.3d 74. *See* Utah R. Civ. P. 56(a). "We review a district court's grant of summary judgment, as well as the court's interpretation of contracts upon which the summary judgment was based, for correctness," *Desert Mountain*, 2017 UT App 218, ¶ 11 (quotation simplified), viewing "the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party," *iDrive Logistics LLC v. IntegraCore LLC*, 2018 UT App 40, ¶ 30, 424 P.3d 970 (quotation simplified), *cert. denied*, 425 P.3d 803 (Utah 2018).

¶20 On cross-appeal, Montgomery challenges the trial court's award of prejudgment interest to CWS. "A trial court's decision to grant or deny prejudgment interest presents a question of law which we review for correctness." *Diversified Striping Sys. Inc. v. Kraus*, 2022 UT App 91, ¶ 44, 516 P.3d 306 (quotation simplified).

¶21 Montgomery also challenges the trial court's award of attorney fees to CWS, arguing the court incorrectly determined CWS was the prevailing party and did not adequately support its award with factual findings. "Whether a party is the prevailing

party in an action is a decision left to the sound discretion of the trial court and reviewed for an abuse of discretion." *Giles v. Mineral Resources Int'l, Inc.*, 2014 UT App 37, ¶ 9, 320 P.3d 684 (quotation simplified). "But the related question of whether the trial court's findings of fact in support of an award of fees are sufficient is a question of law that we review for correctness." *Id.* (quotation simplified).

## ANALYSIS

### I. Summary Judgment

¶22 CWS raises several challenges to the trial court's grant of partial summary judgment in Montgomery's favor. None are availing.

### A.    Plain Language of the Operating Agreement

¶23 First, CWS argues that Montgomery was not entitled to partial summary judgment because the plain language of the Operating Agreement prohibited him from deferring his compensation.

¶24 "When we interpret a contract," such as the Operating Agreement, "we start with its plain language"—"the ordinary and usual meaning of the words." *Airstar Corp. v. Keystone Aviation LLC*, 2022 UT App 73, ¶ 53, 514 P.3d 568 (quotation simplified). "We look for a reading that harmonizes the provisions and avoids rendering any provision meaningless." *KeyBank NA v. Systems West Computer Resources, Inc.*, 2011 UT App 441, ¶ 19, 265 P.3d 107 (quotation simplified), *cert. denied*, 275 P.3d 1019 (Utah 2012). *See UDAK Props. LLC v. Canyon Creek Com. Center LLC*, 2021 UT App 16, ¶ 18, 482 P.3d 841 ("An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless, or inexplicable.") (quoting 11 Williston on Contracts § 32:5 (4th ed.

2020)), *cert. denied*, 509 P.3d 768 (Utah 2022). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Airstar Corp.*, 2022 UT App 73, ¶ 53 (quotation simplified).

¶25 Here, both parties assert that the Operating Agreement is unambiguous and should be construed in accordance with its plain language. But they take different views about what that plain language means.

¶26 CWS points to section 5.9(a) of the Operating Agreement, which required Montgomery, as Manager, to "cause [CWS] to," among other things, "[p]ay its own liabilities, indebtedness and obligations out of its own assets as the same shall become due," "[p]ay the salaries of its own employees," and "[m]aximize the Available Cash Flow of" CWS. CWS also stresses the fact that Exhibit B to the Operating Agreement stated that the "salary of $150,000 per year shall be paid to the Manager through [CWS's] regular payroll" and the bonus "shall be computed and paid to the Manager each quarter of each fiscal year," with the exception of the fourth quarter bonus, which was to be "re-calculated for the entire fiscal year" and "paid based on this recalculation." CWS further notes that the Operating Agreement permitted a change to "the terms of employment or compensation of any Manager or Member" only upon "approval of Members owning more than fifty percent (50%) of the total Membership Percentages." CWS urges that Montgomery's deferral of his salary and bonuses was a change to the compensation structure that he could not unilaterally make with his 45% membership interest.

¶27 Montgomery, on the other hand, contends that nothing in the Operating Agreement prevented him from deferring his salary and bonuses or indicated that he would forfeit this compensation if he did so. Rather, he argues that under section

5.1(a) of the Operating Agreement, he had "sole discretion" to "take any and all such actions on behalf of" CWS as he "deem[ed] necessary, desirable or advisable," and that under section 5.2, he had "the exclusive and complete power, authority and discretion to manage, control and make all decisions regarding the Business." Montgomery also notes that section 5.9(a) required him, as Manager to, among other things, "[m]aximize the Available Cash Flow of" CWS, and he argues that under Article II's definition of "Available Cash Flow," this included setting aside "such reasonable reserves as may be established by the Manager for accrued and future Expenses." Montgomery further argues that deferring his compensation was not "changing the terms of . . . compensation" requiring approval of majority members because only the timing of payment was affected by his decision, not the amount of the salary and bonus payments to which he was entitled.

¶28 We agree with Montgomery that while the terms of Exhibit B entitled him to an annual salary and quarterly bonuses, the other terms of the Operating Agreement did not prevent him from deferring payment of this compensation. In fact, the Operating Agreement granted Montgomery, as Manager, broad discretion. And in context, the terms in Exhibit B were included for Montgomery's benefit. We agree that Montgomery's deferral of amounts due to him was within the scope of his discretion. Concluding otherwise would result in Montgomery—who CWS admits consistently increased the revenue of the company—forfeiting years' worth of compensation. "We will not interpret the contract to yield such inequitable results." *Green River Canal Co. v. Thayn*, 2003 UT 50, ¶ 33, 84 P.3d 1134. *See id.* ¶ 24 ("Where there is doubt about the interpretation of a contract, a fair and equitable result will be preferred over a harsh and unreasonable one. And an interpretation that will produce an inequitable result will be adopted only where the contract expressly and unequivocally so provides that there is no other reasonable interpretation to be given it.") (quotation simplified).

¶29   Employing a properly harmonized reading of the Operating Agreement, we conclude that its plain language did not prevent Montgomery from deferring his compensation, even though he would have been entitled to take every penny he was due in the timeframe outlined in Exhibit B had he so elected.

B.   Disputed Facts Regarding Damages

¶30   Next, CWS argues that the trial court ignored its arguments regarding Montgomery's entitlement to his deferred compensation. In granting partial summary judgment to Montgomery, the court concluded, "The issue of compensation was not disputed by [CWS], but on the amount owed. As [Montgomery] conceded at the hearing to accept the amount [CWS] agreed was owed, [Montgomery] is granted judgment thereon." On appeal, CWS argues that, contrary to the court's conclusion, it contested both the availability and amount of Montgomery's unpaid compensation and, in doing so, created a genuine dispute of material fact precluding summary judgment.

¶31   Montgomery asserted several different figures for his unpaid compensation and bonuses in his counterclaim and in arguing his motion for summary judgment. CWS contested these amounts. But during argument on the motion, Montgomery's counsel stated, "His compensation—the amounts he deferred are completely undisputed. There's no dispute there. We're talking about $1.5 million," though Montgomery had not previously raised this exact amount. And recognizing that there was "a slight tweak of a few dollars" in CWS's calculation of what Montgomery was owed, Montgomery's counsel then stated Montgomery would "go along with that." Given this apparent agreement, we cannot say that the trial court erred in concluding there was no genuine dispute regarding damages.

C.     Montgomery's Substantial Performance

¶32    Finally, CWS argues that to prevail on his counterclaim via summary judgment, Montgomery was required to show his substantial performance under the Operating Agreement. CWS argues that Montgomery could not do so and that the trial court could not conclude he had substantially performed, where the court also determined that material issues of fact remained regarding whether Montgomery otherwise breached the Operating Agreement through his involvement with Capitol. Montgomery sees this argument as unpreserved, and so do we.

¶33    "If a party fails to raise an issue at the appropriate time, the party risks losing the opportunity to have the court address that issue." *Lavender v. FCOI Preserve, LLC*, 2025 UT App 47, ¶ 46, 569 P.3d 1037 (quotation simplified), *cert. denied*, 570 P.3d 660 (Utah 2025). "An issue is properly preserved when it has been presented to the district court in such a way that the court had an opportunity to rule on it"—i.e., the issue was "specifically raised by the party asserting error, in a timely manner, and . . . supported by evidence and relevant legal authority." *Id.* (quotation simplified). Before the trial court, CWS advanced several arguments as to why Montgomery could not prevail on his counterclaim, but his failure to prove his substantial performance was not among them. CWS neither specifically mentioned the doctrine of substantial performance nor cited any authority on that point. Thus, we cannot say that the issue was presented to the trial court at all. Accordingly, we do not address it further. *See Winn v. McKinlay*, 2025 UT App 16, ¶ 39, 565 P.3d 101 ("When it is clear that an appellant is raising an entirely new legal theory on

appeal, we may simply apply the preservation rule and decline to address the newly raised issue.").[2]

¶34 In sum, the plain language of the Operating Agreement did not prevent Montgomery from deferring his compensation, there was no dispute of fact regarding his entitlement to unpaid compensation, and CWS has not preserved its argument regarding his substantial performance. We thus affirm the trial court's grant of partial summary judgment in Montgomery's favor.[3]

---

2. Montgomery's breach of the Operating Agreement based on his involvement with Capitol, which CWS argues on appeal precluded him from showing substantial performance, was dealt with at trial, the result being an award of damages to CWS pursuant to a provision of the Operating Agreement that laid out the remedy for engaging in a "Competing Activity."

3. CWS argues that if we determine summary judgment was appropriate, the amount of unpaid compensation Montgomery received should be reduced because Montgomery's calculation contained mathematical errors, Montgomery's counsel stipulated to a lower amount at argument on his motion for summary judgment, and the statute of limitations operates to preclude some of his claimed compensation. We are not persuaded. The need for a more precise calculation in Montgomery's motion—including any mathematical errors therein—was obviated by the parties' later agreement as to the amount due Montgomery. *See supra* ¶ 31. Nor does the statute of limitations reduce these damages. The applicable "statute of limitations for an action upon any contract is six years," which "ordinarily begins to run when the breach occurs." *Hunter v. Finau*, 2024 UT App 17, ¶ 18, 545 P.3d 294 (quotation simplified), *cert. denied*, 550 P.3d 993 (Utah 2024). Here, the breach occurred when CWS removed Montgomery as

(continued…)

## II. Prejudgment Interest

¶35   "The purpose of awarding prejudgment interest is to compensate a party for the depreciating value of the amount owed over time and, as a corollary, to deter parties from intentionally withholding an amount that is liquidated and owing." *Diversified Striping Sys. Inc. v. Kraus*, 2022 UT App 91, ¶ 77, 516 P.3d 306 (quotation simplified). "In Utah, prejudgment interest is recoverable where the damage is complete, the amount of the loss is fixed as of a particular time, and the loss is measurable by facts and figures." *Id.* (quotation simplified). "This standard focuses on the measurability and calculability of the damages" and requires "the amount of the loss to be calculated with mathematical accuracy in accordance with well-established rules of damages." *Id.* (quotation simplified). Thus,

> courts will not award prejudgment interest in cases where the trier of fact has to use its best judgment in assessing the amount to be allowed for past as well as for future injury, such as personal injury cases, cases of death by wrongful act, libel, slander, false imprisonment and all cases where the damages are incomplete and are peculiarly within the province of the jury to assess at the time of trial.

*Lavender v. FCOI Preserve, LLC*, 2025 UT App 47, ¶ 112, 569 P.3d 1037 (quotation simplified), *cert. denied*, 570 P.3d 660 (Utah 2025). In other words, "prejudgment interest is inappropriate in cases where the trier of fact is left to assess damages based on a mere description of the wrongs done or injuries inflicted." *Encon Utah,*

---

Manager in June 2019 and refused to pay him his deferred compensation. Montgomery filed his counterclaim in June 2020—well within the statutory period. Thus, we conclude that the amount of Montgomery's compensation should not be reduced.

*LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 53, 210 P.3d 263 (quotation simplified).

¶36 Here, the trial court awarded prejudgment interest to CWS on its Capitol-related damages "at the rate of 10% per annum" on the following figures:

> $257,243—from December 31, 2017, to entry of judgment
>
> $343,358—from December 31, 2018, to entry of judgment
>
> $67,000—from April 1, 2019, to entry of judgment
>
> $1,502,000—from April 1, 2019, to entry of judgment

And the court awarded 10% prejudgment interest on the line-item damages from "the date CWS filed its action against Montgomery" to "the date Montgomery tendered a check for those damages."

¶37 Montgomery argues the court erred in awarding prejudgment interest on either category of damages. For reasons hereafter explained, we partially agree and partially disagree with Montgomery, remanding the issue of prejudgment interest on the Capitol damages and reversing the award on the line-item damages.

A.     Capitol-Related Damages

¶38 Montgomery argues that the trial court erred in granting prejudgment interest on the Capitol-related damages because CWS's damages were not fixed as of a particular time and were not subject to mathematical calculation. He further contends that the interest was not based on the damages figure actually awarded by the jury, "ignor[ing] the compensatory purpose of

prejudgment interest and mak[ing] the award punitive and an unjust windfall to CWS."

¶39   First, we conclude that prejudgment interest was appropriate on the Capitol-related damages. Under section 5.6 of the Operating Agreement, the remedy for any "Competing Activity" was CWS's "right in, or to, such other ventures or activities and to the income and proceeds derived from any such violative actions." The parties stipulated to the distributions and earnings Montgomery received from Capitol as well as to the years in which he received these distributions and earnings. While the jury was presented with various theories of damages calculations at trial, the figures those calculations were based on were static. *See Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 55, 210 P.3d 263 ("Where damage figures are subject to calculation, . . . even if the method of calculating is uncertain, or the damage figures change, prejudgment interest is appropriate."). *See also id.* ¶ 64 ("A dispute, even between experts, as to the precise amount of damages does not necessarily preclude those damages from being measurable or calculable."). The jury was not left to "assess damages based on a mere description of" CWS's losses. *Id.* ¶ 53 (quotation simplified). Thus, the Capitol damages were measurable, calculable, and fixed as of a particular time, and as such, they were subject to prejudgment interest.

¶40   But while prejudgment interest was warranted on these Capitol damages, the trial court based the interest on an incorrect figure. The jury awarded CWS $1,809,601 for Montgomery's competing activities related to Capitol. The jury reached this figure based on Montgomery's expert's theory of damages, which used the aggregated amounts stipulated to: $667,601 in distributions Montgomery received over the course of three years and $1,502,000 in proceeds from the sale of his interest in Capitol, less his $360,000 in capital contributions to Capitol. But the trial court awarded prejudgment interest on the Capitol damages based solely on Montgomery's distributions and earnings,

totaling $2,169,601. Prejudgment interest must be based on the actual damages award, as its whole purpose is to compensate for the "depreciating value" of those damages. *See Diversified Striping Sys. Inc. v. Kraus*, 2022 UT App 91, ¶ 77, 516 P.3d 306 (quotation simplified). We thus remand for the trial court to amend its judgment to reflect prejudgment interest on the Capitol damages figure awarded by the jury.

B.      Line-Item Damages

¶41    Montgomery also challenges the trial court's prejudgment interest award on the line-item damages. Here, we agree with Montgomery that prejudgment interest was unwarranted.

¶42    Prior to litigation, in August 2019, Montgomery tendered payment for many of the damages CWS later claimed in its complaint. CWS refused this initial tender and filed its complaint in May 2020. In October 2023, Montgomery tendered payment of $249,907 on some of these damages. This time, CWS accepted the tender and agreed to drop this aspect of its claim. The court later awarded prejudgment interest on the $249,907 line-item damages for the period between May 8, 2020, when CWS filed its complaint, to October 27, 2023, when Montgomery tendered payment.

¶43    Montgomery claims that CWS's refusal of his initial tender precluded its entitlement to prejudgment interest, as he did not withhold these damages. He argues that CWS cannot have the benefit of prejudgment interest on these damages after refusing the tender prior to May 2020. On the other hand, CWS contends that Montgomery's initial tender was invalid and, thus, does not prevent prejudgment interest. CWS points to language in Montgomery's answer to CWS's complaint in which he referred to this initial tender and stated that he had made it "without admitting any personal responsibility" or "without admitting any liability." Thus, CWS reasons, Montgomery conditioned this tender on "full settlement of the dispute."

¶44   "A tender, to be good, must be free from any condition which the tenderer does not have a right to insist upon." *New York Avenue LLC v. Harrison*, 2016 UT App 240, ¶ 40, 391 P.3d 268 (quotation simplified), *cert. denied*, 393 P.3d 283 (Utah 2017). But we do not read the language in Montgomery's answer as creating an impermissible condition.

¶45   Ultimately, "the purpose of awarding prejudgment interest is to compensate for the full loss suffered by the plaintiff in losing the use of the money over time," and it "represents an amount awarded as damages due to the opposing party's delay in tendering the amount owing under an obligation." *Kraatz v. Heritage Imports*, 2003 UT App 201, ¶ 75, 71 P.3d 188 (quotation simplified), *cert. denied*, 84 P.3d 239 (Utah 2003). Montgomery did not delay tendering the amount CWS claimed he owed for the line-item damages. In his answer, Montgomery stated that he had asked CWS for further clarification on what he owed for these various line-item damages but CWS did not provide details. CWS later accepted $249,907 for these line-item damages—much less than the $1 million it claimed in its trial exhibit. The delay here was caused by CWS's refusal to accept Montgomery's initial tender, not Montgomery's delay in making the tender. Awarding prejudgment interest under these circumstances would be inconsistent with the purpose of such an award. *Cf. Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 28, 163 P.3d 615 (concluding as a matter of statutory interpretation that "it is absurd to require a defendant to pay interest on money that has already been remitted to the plaintiff" and that doing so "would blatantly controvert the express purpose" of a statute providing for prejudgment interest, "which is to encourage the prompt payment of amounts not in dispute").

¶46   Thus, while we conclude prejudgment interest was appropriate on the Capitol-related damages, the same cannot be said for the line-item damages. Because the prejudgment interest on the Capitol damages was based on an incorrect damages

figure, we remand this portion of the judgment to the trial court for correction. And we reverse the court's award of prejudgment interest on the line-item damages.

## III. Attorney Fees

¶47 Montgomery also challenges the trial court's award of attorney fees to CWS. In particular, he takes issue with the court's determination that CWS was the prevailing party, pointing to the court's fee ruling itself, which he asserts "provided no insight into how it concluded that CWS prevailed." We are persuaded by this point.

¶48 "In Utah, attorney fees are awarded only if authorized by statute or contract. If provided for by contract, attorney fees are awarded in accordance with the terms of the contract." *Capozzoli v. Madden*, 2024 UT App 176, ¶ 48, 561 P.3d 727 (quotation simplified). Here, section 7.3 of the Operating Agreement stated, "If [CWS] or any Member obtains a judgment against a Member or [CWS] by reason of breach of this Agreement or failure to comply with the provisions hereof, the prevailing party's reasonable attorneys' fees as fixed by the court shall be included in such judgment." In situations such as these, "where the parties fail to define 'prevailing party,'" the court is "afforded discretion regarding prevailing party determinations." *Young H2ORE LLC v. J&M Transmission LLC*, 2024 UT App 10, ¶ 26, 543 P.3d 1264 (quotation simplified). As this "is often an imprecise process," Utah courts follow "a flexible and reasoned approach for determining which party has emerged the comparative winner." *Olsen v. Lund*, 2010 UT App 353, ¶ 7, 246 P.3d 521 (quotation simplified). This approach requires trial courts to consider various factors, including "(1) the language of the attorney fee provision, (2) the number of claims brought by the parties, (3) the importance of each claim relative to the others and their significance considering the lawsuit as a whole, and (4) the amounts awarded

on the various claims." *Wihongi v. Catania SFH LLC,* 2020 UT App 109, ¶ 9, 472 P.3d 308 (quotation simplified).

¶49 Ultimately, "although a trial court has discretion to determine an award of attorney fees, the exercise of that discretion must be based on an evaluation of the evidence." *Foote v. Clark*, 962 P.2d 52, 57 (Utah 1998) (quotation simplified). "Utah appellate courts have consistently encouraged trial courts to make findings to explain the factors which they considered relevant in arriving at an attorney fee award." *Selvage v. J.J. Johnson & Assocs.*, 910 P.2d 1252, 1265 (Utah Ct. App. 1996) (quotation simplified). *See Monaco Apartment Homes v. Figueroa*, 2021 UT App 50, ¶ 6, 489 P.3d 1132 ("An award of attorney fees must generally be made on the basis of findings of fact supported by the evidence and appropriate conclusions of law[.]") (quotation simplified). These findings "should detail the factors considered dispositive by the trial court in calculating the award" to "enable the reviewing court to make an independent review of the fee award." *Foote*, 962 P.2d at 55. Documenting these factors is especially important where "the evidence submitted to support the fee request is controverted or inconsistent." *Id.* at 57. "Where the inadequacy of the trial court's findings of fact and conclusions of law results in our inability to ascertain the basis of the trial court's decision, we are prevented from effectively reviewing the trial court's decision and may remand for the entry of more-detailed findings." *Monaco*, 2021 UT App 50, ¶ 6 (quotation simplified).

¶50 Here, the trial court issued a very terse ruling, stating only, "The Court determines [Montgomery] did not prevail and is not entitled to his attorney fees. [CWS] shall be awarded their fees." As CWS acknowledges, this did not disclose the court's findings or conclusions. Nor can we imply such findings. *See Foote*, 962 P.2d at 56 (noting that while appellate courts "may uphold a fee award when no findings of fact have been entered on the record when it would be reasonable to assume that such findings actually had been made," this was not such a case, as the "trial court did

not enter any findings of fact setting forth the steps of its evaluation or supporting its fee award"). *See also Miller v. Martineau & Co.*, 1999 UT App 216, ¶ 47, 983 P.2d 1107 ("[C]ases remanding conclusory attorney fee awards for the entry of adequate findings are legion, while one looks in vain for a single case in which either Utah appellate court has implied the findings necessary to sustain an award of attorney fees not supported by adequate express findings.") (citations omitted).

¶51 Consequently, we are unable to meaningfully review the fee award here, including the court's determination that CWS was the prevailing party, and we reverse and remand for the trial court to reconsider attorney fees. However, as the issue will arise on remand, we discuss some further aspects of the prevailing party determination that may prove useful. *See Young H2ORE LLC*, 2024 UT App 10, ¶ 48.

¶52 Again, "the question of which party prevailed depends, to a large measure, on the context of each case, and, therefore, it is appropriate to leave this determination to the sound discretion of the trial court." *Wihongi*, 2020 UT App 109, ¶ 8 (quotation simplified). "We recognize that, in many instances," in following the flexible and reasoned approach outlined above, trial "courts will by necessity conclude that only one party prevailed in the litigation." *Young H2ORE LLC*, 2024 UT App 10, ¶ 49. "But courts are to engage in a case-by-case evaluation and they have the flexibility to handle circumstances where *both*, or neither, parties may be considered to have prevailed." *Id.* (emphasis in original; quotation otherwise simplified). While we do not dictate which factors the court should consider, we note that "[t]he court cannot properly evaluate a claim for fees without measuring the request against at least some established touchstones." *Foote*, 962 P.2d at 57. One such touchstone is the net judgment rule. Our Supreme Court has "cautioned against considering only the net judgment in the case" and has "stressed the importance of looking at the amounts actually sought and then balancing them proportionally

with what was recovered." *Wihongi*, 2020 UT App 109, ¶ 9 (quotation simplified). But here, where the parties received similar judgment amounts, the net judgment may provide a useful starting place for the court in reassessing fees. *See Olsen*, 2010 UT App 353, ¶ 7 ("The net judgment rule will usually be at least a good starting point, but it should not be mechanically applied.") (quotation simplified).

¶53 "A trial court may . . . select, according to the factually varied context of each particular case, the factors that are most relevant to its fee calculation—but select them it must." *Foote*, 962 P.2d at 56–57. And it must explain them, too. Thus, we remand the issue of attorney fees to the trial court—not to allow the court to retroactively justify its original fee award but, instead, to provide it the opportunity to consider attorney fees anew, detailing the factors it considers in doing so.[4]

---

4. Montgomery seeks an award of attorney fees incurred on appeal. "As a general matter, when a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Globe Contracting LLC v. Hour*, 2025 UT App 98, ¶ 89 n.14, 575 P.3d 235 (quotation simplified). But because we remand for the trial court to consider attorney fees anew, we do not yet know who the prevailing party is below, and we cannot now award appellate attorney fees on this basis. We therefore also leave that determination to the trial court on remand. *See Williamson v. Farrell*, 2024 UT App 111, ¶ 46 n.14, 557 P.3d 214 ("Because we remand the issue of attorney fees for the trial court to consider anew, [the appellees'] entitlement to attorney fees at the trial court level is yet to be determined. Thus, any appropriate award of attorney fees on appeal is dependent upon that determination and should be assessed by the district court on remand.") (quotation simplified).

CONCLUSION

¶54    The Operating Agreement did not prevent Montgomery from deferring his compensation, there was no dispute as to the unpaid compensation owed him, and CWS did not preserve its argument regarding Montgomery's substantial performance. Thus, we conclude partial summary judgment in Montgomery's favor was appropriate. And while prejudgment interest was warranted on CWS's Capitol-related damages, the same is not true for the prejudgment interest awarded on the line-item damages. Lastly, we conclude that in the absence of adequate findings, the trial court's attorney fee award cannot stand. Accordingly, we reverse the prejudgment interest award on the line-item damages and remand the prejudgment interest award on the Capitol damages for the trial court to bring it in line with the damages awarded by the jury. And we reverse the attorney fee award and remand for the court to resolve that issue anew.

———————